No. 25-3929

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WORLD ASSOCIATION OF ICEHOCKEY PLAYERS
UNIONS NORTH AMERICA DIVISION et al.,

*Appellants,*

v.

NATIONAL HOCKEY LEAGUE et al.,

*Appellees.*

On Appeal from the United States District Court
for the Western District of Washington

### APPELLANTS' OPENING BRIEF

Jeffrey I. Shinder
Ethan E. Litwin
Tyler S. Ross
SHINDER CANTOR LERNER LLP
14 Penn Plaza, 19th Floor
New York, NY 10122
(646) 960-8601

J. Wyatt Fore
SHINDER CANTOR LERNER LLP
600 14th Street NW, 5th Floor
Washington, DC 20005
(646) 960-8612

Eric F. Citron
ZIMMER, CITRON & CLARKE LLP
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 796-4540

Lindsey Powell
ZIMMER, CITRON & CLARKE LLP
345 W. Washington Ave. #300
Madison, WI 53703
(608) 394-6750

*Additional Counsel on Inside Cover*

Michael Rubin
Stacey Leyton
Bronwen O'Herin
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

James R. Martin
Jennifer Duncan Hackett
ZELLE LLP
1775 Pennsylvania Ave. NW
Suite 375
Washington, DC 20006
(202) 899-4101

Judith A. Zahid
Sarah Van Culin
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
(415) 693-0700

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, plaintiffs World Association of Icehockey Players Unions North America Division and World Association of Icehockey Players Unions USA Corporation certify that they have no parent corporations and that no publicly held corporation owns more than ten percent of either entity.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................1

STATEMENT OF JURISDICTION ........................................3

STATEMENT OF THE ISSUES ............................................3

PERTINENT STATUTES .......................................................4

STATEMENT OF THE CASE................................................4

    A.    STATUTORY BACKGROUND ................................4

    B.    FACTUAL BACKGROUND ....................................7

    C.    PROCEDURAL BACKGROUND ..........................16

SUMMARY OF ARGUMENT ..............................................21

STANDARD OF REVIEW ...................................................25

ARGUMENT..........................................................................26

    I.    Personal Jurisdiction Over the Eastern League Defendants Under the Clayton Act Is Consistent with Due Process. .................26

        A.    *Fuld* easily supports personal jurisdiction over the Eastern League defendants. ...........................................26

        B.    Jurisdiction over the Eastern League defendants would also be constitutional under a pre-*Fuld* analysis. ........................32

    II.    The FTAIA Allows All of Plaintiffs' Claims. ....................................38

    III.    Considerations of International Comity Do Not Support the Dismissal of Claims that Congress Determined Should Be Adjudicated Under U.S. Law by U.S. Courts. ...................................53

CONCLUSION ......................................................................66

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.,*
  368 F.3d 1174 (9th Cir. 2004)............................................................7, 26

*Berg v. Canadian Hockey League,*
  No. CV-14-514423CP (Super. Ct. Ont.) ........................................16

*Briskin v. Shopify, Inc.,*
  135 F.4th 739 (9th Cir. 2025)................................................................32

*Calder v. Jones,*
  465 U.S. 783 (1984)...........................................................33, 35, 37

*Carcillo v. Central Hockey League,*
  No. 20-CV-642705 (Super. Ct. Ont.) ............................................16

*Caribbean Broadcasting System v. Cable & Wireless PLC,*
  148 F.3d 1080 (D.C. Cir. 1998)......................................................46, 47

*City of Tucson v. United States W. Commc'ns, Inc.,*
  284 F.3d 1128 (9th Cir. 2002) .........................................................56

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.,*
  960 F.3d 549 (9th Cir. 2020)........................................26, 59, 61, 62

*D'Augusta v. American Petroleum Inst.,*
  117 F.4th 1094 (9th Cir. 2024), *cert. denied,*
  145 S. Ct. 1478 (2025)...................................................18, 25, 26, 27

*Daniel v. American Bd. of Emergency Med.,*
  428 F.3d 408 (2d Cir. 2005) ............................................................17

*Deakins v. Monaghan,*
  484 U.S. 193 (1988)......................................................................24, 56

*In re Dynamic Random Access Memory Antitrust Litig.,*
  546 F.3d 981 (9th Cir. 2008).................................................7, 46, 49

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*,
   417 F.3d 1267 (D.C. Cir. 2005) ........................................................47

*F. Hoffmann–La Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ................................................................*passim*

*Fuld v. Palestine Liberation Organization*,
   606 U.S. 1 (2025) ..................................................................*passim*

*Gross v. German Found. Indus. Initiative*,
   456 F.3d 363 (3d Cir. 2006) ..........................................56, 57, 59, 61

*Hartford Fire Ins. Co. v. California*,
   509 U.S. 764 (1993) ........................................................53, 55, 65

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) ..........................................................61

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) ........................................................33, 36, 37

*LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*,
   124 F.4th 1122 (9th Cir. 2024) ......................................................25

*McEwan v. Canadian Hockey League*,
   No. S190264 (Sup. Ct. B.C.) ........................................................16

*Minn-Chem, Inc. v. Agrium Inc.*,
   683 F.3d 845 (7th Cir. 2012) ........................................................43

*Mohr v. NHL*,
   [2021] FC 488 (Fed. Ct. Can.) ................................................16, 62

*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014) ..............................54, 57, 59, 60, 61, 62

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   20 F.4th 466 (9th Cir. 2021) ..........................................................4

*Peridot Tree, Inc. v. City of Sacramento*,
   94 F.4th 916 (9th Cir. 2024) ........................................................56

*Quackenbush v. Allstate Ins. Co.,*
 517 U.S. 706 (1996) ............................................................................56

*Tanaka v. University of S. Cal.,*
 252 F.3d 1059 (9th Cir. 2001) ..............................................................4

*Timberlane Lumber Co. v. Bank of Am.,*
 549 F.2d 597 (9th Cir. 1976) ........................................................55, 57

*United States v. Hui Hsiung,*
 778 F.3d 738 (9th Cir. 2015) ............................................................4, 5

*United States v. LSL Biotechnologies,*
 379 F.3d 672 (9th Cir. 2004) ................................................................5

*Vertiv, Inc. v. Wayne Burt PTE, Ltd.,*
 92 F.4th 169 (3d Cir. 2024) ..........................................................54, 59

*WAIPU v. NHL,*
 No. 24-1066, 2024 WL 4893266 (S.D.N.Y. Nov. 26, 2024) ...........17

*In re Western States Wholesale Nat. Gas Antitrust Litig.,*
 715 F.3d 716 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.,*
 575 U.S. 373 (2015) ......................................................................26, 27

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,*
 433 F.3d 1199 (9th Cir. 2006) ............................................................37

**Statutes**

15 U.S.C. § 1 ............................................................................................4

15 U.S.C. § 6a ........................................................................4, 5, 38, 39

15 U.S.C. § 22 ..................................................................7, 18, 24, 27, 53, 58

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

iv

28 U.S.C. § 1332(d) ..................................................................3

28 U.S.C. § 1337 ......................................................................3

Competition Act, R.S.C. 1985, c C-34 (2023)....................................62

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......................................................3

## INTRODUCTION

The defendants in this case have deliberately restrained competition for elite hockey talent across North America, leaving young prospects with little-to-no say about where they play and on what terms. The three separate leagues that comprise these players' main pipeline to the National Hockey League (NHL) have divided the United States and Canada into eastern, western, and central regions and given each league an exclusive territory to avoid competing for talent. They have also established player drafts and uniform contract terms that prevent players from shopping their skills to other teams, without the benefit of collective bargaining or any other protection. The result is that players as young as 14 must accept grossly exploitative terms to pursue their professional hockey dreams.

The players caught in this system often end up many hundreds of miles from home with meager stipends that do not even cover the cost of getting to practice. And they are compelled to remain with teams that fail to support them—or else walk away from hockey altogether. Defendants' restraints on players' ability to pursue the opportunities that best fit their needs can thus do enormous damage to these players' lives and careers that goes far beyond the inadequacy of their financial compensation.

Plaintiffs filed suit under the Sherman Act to redress these harms to American and Canadian players. They explained that defendants colluded to limit competition across the entire North American hockey market, and that their cross-border operations directly restrained and adversely affected U.S. commerce to the substantial detriment of both American and Canadian players. Defendants' intentional conduct in allocating each of the 50 States to a particular league, and the cross-border harms that inevitably followed, support personal jurisdiction over these corporate defendants under § 12 of the Clayton Act. And they also make clear that plaintiffs' Sherman Act claims may proceed consistent with the limitations of the Foreign Trade Antitrust Improvements Act (FTAIA).

The district court incorrectly applied these doctrines to whittle plaintiffs' claims to a subset that—as even that court recognized—Congress plainly intended to be heard by U.S. courts applying U.S. law. And the court then further erred by dismissing even the remaining claims based on "comity" towards Canada. These errors collectively reflect a misunderstanding of defendants' cross-border restraints of trade, their deliberate effects on U.S. commerce, and Congress's explicit choices about the harms U.S. antitrust law should address. This Court should reverse.

2

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.  2-ER-192.  Personal jurisdiction as to certain defendants is contested.  The district court granted defendants' motion to dismiss on May 23, 2025, and on the same date denied as moot plaintiffs' motion for a preliminary injunction.  1-ER 3, 5.  Plaintiffs timely noticed this appeal on June 20, 2025.  2-ER-74; *see* Fed. R. App. P. 4(a)(1)(A).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether personal jurisdiction lies over certain defendants because they are covered by Clayton Act § 12 and that statute comports with the Fifth Amendment under *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025).

2.  Whether the FTAIA's rules governing the Sherman Act's territorial reach preserve the claims of Canadian players who were allocated to Canadian teams due to defendants' competitive restraints.

3.  Whether the district court abused its discretion by declining to exercise jurisdiction over antitrust claims that Congress specifically assigned to the federal courts, particularly given that those statutes already account for considerations of international comity.

3

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  "The elements of a § 1 claim are: (1) a contract, combination, or conspiracy; (2) 'that unreasonably restrained trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) that . . . affected interstate commerce.'"  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021) (quoting *Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001)).  "[P]rice fixing and market allocation are *per se* [§] 1 violations."  *Id.*

As relevant here, the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, limits the Sherman Act's extraterritorial reach to ensure respect for the regulatory authority and sovereign interests of other nations in matters involving purely foreign commerce.  "Congress enacted the FTAIA in 1982 in response to concerns regarding the scope of the broad jurisdictional language in the Sherman Act.'"  *United States v. Hui Hsiung*,

4

778 F.3d 738, 751 (9th Cir. 2015) (cleaned up). The Act "seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." *Id.* (quoting *F. Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004)); *see United States v. LSL Biotechnologies*, 379 F.3d 672, 678 (9th Cir. 2004) ("The FTAIA was intended to exempt from the Sherman Act export transactions that did not injure the United States economy." (quotation marks omitted)).

Consistent with that purpose, "the FTAIA does not alter the Sherman Act's coverage of import trade," which "is excluded from the FTAIA altogether." *Hui Hsiung*, 778 F.3d at 751. That limitation is sometimes referred to as the import trade exclusion, *id.* at 755 n.8, and it is conveyed by the statute's opening clause, which provides that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations, unless" the statute's other terms are met, 15 U.S.C. § 6a. Those other terms—which are known as the domestic-effects exception—provide that the Sherman Act applies even

5

when the alleged misconduct restrains only non-import foreign commerce if that conduct has a "direct, substantial, and reasonably foreseeable effect . . . on trade or commerce which is not trade or commerce with foreign nations [*i.e.*, domestic commerce], or on import trade or import commerce with foreign nations" and that effect "gives rise to" the claim. *Id.* § 6a(1)-(2); *see Empagran*, 542 U.S. at 162.

If anticompetitive conduct "significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect" and the "foreign harm alone gives rise to the plaintiff's claim," the FTAIA does not allow the claim alleging adverse foreign effects to proceed. *Empagran*, 542 U.S. at 164-65. But the Sherman Act applies—and the claim may proceed—if the foreign harm is "inextricably bound up with domestic restraints" and effects. *Id.* at 171-72. Consistent with the statute's text, courts have emphasized that this exception is not concerned with whether a particular injury is foreign or domestic but rather with whether the claimed injury arises from a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce.

*See In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008).

Section 12 of the Clayton Act also speaks to the Sherman Act's jurisdictional reach, as it provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business." 15 U.S.C. § 22. The statute further states that "all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." *Id.* This service-of-process provision authorizes worldwide personal jurisdiction for antitrust claims in the federal courts over any corporation to the extent consistent with the Constitution. *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).

**B.    Factual Background**

For elite hockey players in the United States and Canada, the most likely path to the NHL is through major junior hockey, 2-ER-119, which consists of three independent leagues that collectively market themselves as the Canadian Hockey League (CHL), 2-ER-156, 194-95 (¶¶ 83, 159-60). These leagues are formally known as the Western, Ontario, and Quebec

Maritimes Junior Hockey Leagues. For ease of reference, however, this brief refers to them as the Western, Central, and Eastern Leagues, according to the North American territories allocated to each.

These three independent leagues are each composed of 18-to-22 hockey teams that together are responsible for roughly 1,500 young players. 2-ER-193 (¶ 153). Of the 60 total teams, 9 are based in the United States and the rest are based in Canada. 2-ER-228-29 (¶ 281). Both the Western and Central Leagues have teams in the United States. 2-ER-157, 168 (¶¶ 84, 107). Each league schedules, organizes, and operates its own games; establishes the rules for such games; and organizes drafts for new players. 2-ER-138 (¶ 3). While the leagues collectively market themselves under the umbrella of the CHL, that entity admits that it is not a "league": It has no teams, conducts no drafts, and generally does not schedule, organize, or operate hockey games. 2-ER-137-38 (¶¶ 2-3). As the leagues have stated, each league is a separate economic actor and legal entity, and "none of the leagues or the teams are required to adopt or impose any [CHL] policies or other initiatives." 2-ER-138 (¶ 3).

Nevertheless, these three independent leagues have agreed to limit competition by allocating to each league an exclusive territory spanning the

United States and Canada from which it may recruit, draft, and sign players. The agreement, set forth in the CHL's constitution, states that each league agrees not to compete for the services of hockey players outside its allocated territory. 2-ER-197 (¶ 168). "There are three protected territories, one each for the" Western, Central, and Eastern Leagues, "each of which includes a combination of U.S. states and Canadian provinces." 2-ER-139 (¶ 8). Each league thus "has a strictly defined geographic territory over which it owns the rights of all junior-aged players, who range in age from 16 to 20." 2-ER-197 (¶171) (cleaned up). As illustrated below, these territories include every U.S. State and Canadian Province:



This agreement means that players in the United States and Canada can be scouted, recruited, and drafted only by the major junior teams within the territory where they reside. A player thus has no opportunity to market his services or engage in negotiations with teams in other territories, even if those teams are a better fit for the player or located closer to home. *See, e.g.*, 2-ER-88. These territorial allocations reduce competition for players' labor by roughly two-thirds.

The terms of the annual player draft conducted by each league further reduce competition for players' labor. To obtain new players, the leagues conduct annual entry drafts through which their U.S. and Canadian teams select U.S. and Canadian hockey players as young as 14 years old. 2-ER-196-97, 202, 230-31 (¶¶ 166, 191, 287). These drafts are involuntary, and players do not apply to participate. Instead, the leagues have unilaterally designed a system through which each player is allocated to a team that assumes exclusive control of the player's rights.

Although player drafts might seem familiar to U.S. sports fans, the drafts for leagues like the NHL, NFL, MLB, and NBA are the product of collective bargaining, which provides a necessary bulwark against teams

10

imposing exploitative contract terms upon draftees. By contrast, no labor union represents major junior players, and no collective bargaining agreement has authorized these player drafts. 2-ER-202 (¶ 194). The leagues and their teams have simply conspired to impose this structure to advance their own economic interests at the players' expense.

Through these player drafts, teams select new players from the pool of eligible players who reside within their league's exclusive territory. 2-ER-196-97, 201-03 (¶¶ 166, 187-99). Drafted players then have two options: They can sign what defendants refer to as a "standard player agreement" with the team that drafted them, or they can forgo participation in major junior hockey altogether. 2-ER-140 (¶¶ 13-17). They have no other choice.

The standard player agreement contains uniform terms agreed to by the leagues without any player negotiations, and they are predictably unfavorable to these young players. 2-ER-203-04, 210 (¶¶ 201-05, 224-25). The agreement requires players to train, play, and travel on a team's onerous schedule for a stipend of roughly $250 per month—an amount far less than what other developmental hockey leagues provide. 2-ER-210-11 (¶¶ 228-29). Major junior players are contractually required to participate

in hours of on-ice and off-ice practice every day; travel thousands of miles by bus each winter to and from away games; and live with host families far from home without regard to state, provincial, or national borders. 2ER-194-95, 206-07, 215-16 (¶¶160, 213, 215, 247, 249). Players are also subject to early termination penalties of up to $500,000 if they want to exit their contract and play for another team, even one outside the major junior leagues. 2-ER-140, 209-10 (¶¶17, 221, 228).

Defendants have agreed that once a team has drafted a player, no other major junior team will compete for that player's services. 2-ER-202 (¶ 196). If a player chooses not to sign with his drafting team, the leagues' agreement prevents him from being drafted or signed by any other major junior team, thereby foreclosing any opportunities in major junior hockey. 2-ER-140, 202 (¶14, 196). If a player does not end up on his team's active roster, he is placed instead on a "protected list" that prevents him from marketing his services to other teams—even if it was the team's choice not to roster him. 2-ER-202-05 (¶¶196-97, 206-10). Teams retain the right to trade a player to another team even though the player is unable to freely move between teams or to otherwise market his services. 2-ER-140, 206-08 (¶¶ 18, 215, 218); *see* 2-ER-80, 92-93.

Plaintiffs' declarations detail the significant harms to young players that result from these restraints on trade. American hockey player Isaiah DiLaura explained that when he was 13 and starting to get recruited, "only scouts for the [Western League] could talk to [him] and [his] family since [his home in] Minnesota was not in the boundaries of the other major junior leagues." 2-ER-88. As a result of defendants' agreement, DiLaura could not engage with the many Central or Eastern League teams that were closer to home. *Id.* DiLaura was drafted by a club 1,700 miles away, given a stipend insufficient to cover his basic costs, and "only allowed one visit home to see [his] parents" for a few days each season. 2-ER-89-92. He "had no choice but bear this because" defendants' conduct precluded him from engaging with other teams. 2-ER-92.

Plaintiff Tanner Gould had a similar experience. Gould was drafted by a team in Washington State that was "one of the furthest teams away from [his] home in Calgary." 2-ER-79-80. Gould's declaration describes the players' grueling practice and game schedule and the "strict rule that [players] were not allowed to do schoolwork on game days," making it exceedingly difficult to pursue a high school education. 2-ER-81-82. Gould detailed the "humiliating" measures to which players were routinely

subjected, 2-ER-82-83, as well as the team's failure to properly address Gould's serious back injury, 2-ER-83-84. At the start of Gould's second major junior season, he was traded to a Canadian team located 1,000 miles from his Washington team and 500 miles from his home. He "was told that if [he] didn't accept the trade, the [Washington] team was going to have to cut [him] some time in the future and then [he] would not be able to play at all." 2-ER-85. Gould's experience with this new team was very poor, and his hockey career ended soon thereafter. 2-ER-85-86.

The number of players drafted from the United States and Canada varies each year, but the major junior teams are the primary developmental opportunity for elite players from both countries. While a majority of the teams and drafted players are located in Canada, a substantial number of players are drafted from the United States, and many others play on the nine U.S.-based major junior teams. In a recent Central League draft—to take just one example—81 of the 303 players drafted were from the United States. *See* 1-ER-66. There have been fewer American players selected in other drafts, *see id.*, but for every American player who has devoted his childhood and adolescence to hockey, these drafts are the main pathway to someday playing in the NHL.

14

A subset of major junior players are eligible to realize that dream each year through the NHL player draft. 2-ER-224 (¶ 270). The CHL entered an agreement with the NHL on behalf of the major junior leagues that provides that any player drafted and signed by an NHL team who does not make the opening-day roster (as is common for newly drafted teenagers) will be compulsorily reassigned to his former major junior team. 2-ER-144-45, 224-25 (¶¶ 35-36, 270-71). This agreement prevents major junior players from marketing their services to the American Hockey League and East Coast Hockey League teams affiliated with the NHL, even though players' exclusive contracts with their major junior teams are technically voided when they sign NHL contracts. Major junior players are thus, with the knowledge and participation of the NHL, denied the developmental opportunities and better pay afforded to the largely European and former collegiate players who sign with these NHL affiliates. 2-ER-145, 225-26 (¶¶ 37-40, 272-73). That limitation also harms competition in those developmental leagues, which operate exclusively in the United States.

The treatment of major junior players under the standard player agreement has resulted in prior and ongoing litigation in Canada seeking

relief for physical injuries, physical and sexual abuse, and violations of Canada's wage-and-hours law. *See Carcillo v. Central Hockey League*, No. 20-CV-642705 (Super. Ct. Ont.) (physical and sexual abuse); *McEwan v. Canadian Hockey League*, No. S190264 (Sup. Ct. B.C.) (concussions); *Berg v. Canadian Hockey League*, No. CV-14-514423CP (Super. Ct. Ont.) (wage-and-hour violations). In a separate case, players also challenged defendants' anticompetitive conduct, but the Federal Court of Canada rejected that suit, holding that the Canadian Competition Act did not provide a private cause of action for claims regarding buyer-side restraints in labor markets. *Mohr v. NHL*, [2021] FC 488 (Fed. Ct. Can.).

### C. Procedural Background

1. Plaintiffs in this matter are two labor organizations—the World Association of Icehockey Players Unions North America Division and the World Association of Icehockey Players Unions USA Corp.—and two named individuals who played major junior hockey in the United States and Canada and who seek to represent a class of similarly situated players.

Plaintiffs sued the three independent major junior leagues, their constituent teams, the CHL, and the NHL under the Sherman Act, alleging that defendants conspired to restrain competition in the elite ice hockey

market by dividing up the entirety of the United States and Canada and allocating to each of the three leagues an exclusive territory from which to recruit, draft, and sign players. Plaintiffs initially filed suit in the Southern District of New York, where the NHL has its headquarters, and sought a preliminary injunction to prevent defendants from conducting their 2025 drafts. Plaintiffs filed this action after the first suit was dismissed against the major junior leagues and their constituent teams for lack of personal jurisdiction. *See WAIPU v. NHL*, No. 24-1066, 2024 WL 4893266 (S.D.N.Y. Nov. 26, 2024).[1]

2. Plaintiffs again moved for a preliminary injunction to enjoin the 2025 drafts, and defendants moved to dismiss on various grounds. Some defendants argued that the court lacked personal jurisdiction over them, and some argued that the FTAIA did not permit the claims of American or Canadian players who had been assigned to Canadian teams. All argued

---

[1] The dismissal was based on the conclusion that none of the named plaintiffs alleged an injury in New York, as required by Second Circuit case law (predating *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 16 (2025)) that looks to contacts with the forum state rather than the nation as a whole when assessing personal jurisdiction under Clayton Act § 12. *See Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 424-25 (2d Cir. 2005).

that the district court should refuse to hear any remaining claims based on principles of international comity.

The CHL, the Western League and its teams, and the Central League and all but four of its teams did not dispute the district court's personal jurisdiction under § 12 of the Clayton Act, 15 U.S.C. § 22, which "grant[s] personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation.'" 1-ER-23 (quoting *D'Augusta v. American Petroleum Inst.*, 117 F.4th 1094, 1100 n.1 (9th Cir. 2024)). Of the four Central League teams that disputed jurisdiction, the district court found personal jurisdiction over two. 1-ER-42-45.

As relevant here, the district court found personal jurisdiction lacking over the Eastern League and its teams.[2] At the time of that decision, the Supreme Court had not yet clarified that a federal court's exercise of personal jurisdiction under a federal statute is governed by the Fifth Amendment and subject to a more liberal standard than the one the

---

[2] Plaintiffs are not appealing the denial of personal jurisdiction over the two other non-corporate Central League teams and the NHL (an association). The domestic status of these American entities supports suit in their home districts, and plaintiffs will rely on the availability of that alternative to simplify this appeal.

Fourteenth Amendment imposes on state long-arm jurisdiction. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025). The district court thus applied a Fourteenth Amendment standard and asked whether the Eastern League defendants purposely directed their actions at the United States so as to establish minimum contacts with that forum. The district court held that, because "the challenged agreements were directed at Canada and the United States jointly, not at the United States alone," plaintiffs failed to carry their burden on this point. 1-ER-27.

With respect to the FTAIA, the court first noted that defendants had conceded the viability of Sherman Act claims asserted by American or Canadian players assigned to American teams. 1-ER-52-53. It then held that the FTAIA's domestic-effects exception also allows the claims of American plaintiffs on Canadian teams to proceed. The court understood these plaintiffs to have foreign injuries because they signed contracts with the Canadian teams that drafted them and relocated to Canada for those teams. But the court found that "[i]t is the recruitment (or restrictions on recruitment) in the United States of players that proximately caused those players' foreign injury, because without such recruitment, those players would not have signed [agreements] with Canadian teams." 1-ER-60. And

19

the court concluded that "their being sent to Canada as well as their underpayment thus followed as an immediate consequence of Defendants' activity" while plaintiffs were in the United States. *Id.*

The court nevertheless held that the FTAIA bars the claims of Canadian players allocated to Canadian teams, reasoning that "these players are foreign employees of foreign employers whose injury was suffered independently of any domestic effect of those same foreign employers' anticompetitive conduct in the United States." 1-ER-60. The court concluded that the "theory that foreign injury to this group of players was caused by a trans-national price-fixing conspiracy with the purpose and effect of lowering compensation in the United States is insufficient to trigger the domestic effects exception under the FTAIA." 1-ER-60-61.

Despite its conclusion that Congress, through the FTAIA and Clayton Act, decided that certain of plaintiffs' claims should be adjudicated by U.S. courts applying U.S. law, the district court dismissed these claims on the ground that adjudicative comity towards Canada supported abstention. The court noted that the "vast majority of the conduct at issue—including both the location of Defendants' conduct and the location of Plaintiffs' injuries—is located in Canada," 1-ER-65, and that "Canadian parties

20

predominate in this case," *id.* And while the court acknowledged that "[i]t will certainly affect the United States if corporations are able to restrain competition for the services of Major Junior hockey players who are United States citizens," it found that "Canada also has a legitimate interest" and regulates anticompetitive conduct under its own laws. 1-ER-67.

The court determined that, because Canadian antitrust law does not provide for a remedy in these circumstances, the court should not "supplant Canadian antitrust law with the Sherman Act pursuant to Defendants' limited contacts with the United States." 1-ER-68-69. The court held that "asserting jurisdiction for a small group and allowing the small group to potentially upend the conduct of business that mostly occurs in another country would be like the tail wagging the dog," 1-ER-69, and it dismissed all remaining claims on this basis.

## SUMMARY OF ARGUMENT

**I.** Personal jurisdiction is uncontested as to many defendants, and it should be straightforward as to the rest. The district court dismissed the Eastern League and its teams because it believed they lacked the minimum contacts with the United States that the Fourteenth Amendment required. But that conclusion was premised on the wrong standard—through no

fault of the district court. After that court's decision, the Supreme Court made clear in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1, 15 (2025), that the Fifth Amendment standards of due process applicable to federal statutes authorizing personal jurisdiction in federal court are much less rigorous than those traditionally applied under the Fourteenth Amendment. A federal statute comports with the Fifth Amendment if it "ties federal jurisdiction to conduct closely related to the United States that implicates important" federal policy issues, *id.* at 18—a standard that Clayton Act § 12 easily meets. The conduct of the Eastern League and its teams would in any event support jurisdiction even under a traditional minimum-contacts analysis given defendants' express targeting of the United States. The district court's contrary decision was error.

II. On the merits, defendants do not dispute that the FTAIA allows the claims of American and Canadian players allocated to American teams. And the district court correctly held that the statute also permits claims by American players allocated to Canadian teams. The court's conclusion that the FTAIA nevertheless bars the claims of Canadian players on Canadian teams is wrong, however, for two independent reasons.

22

First, the district court failed to recognize that Canadian players end up on Canadian teams due to labor market restraints defendants impose on U.S. commerce. The challenged restraints prevent all players—including Canadian players—from engaging with American teams to which they could otherwise market their services, both prior to being drafted and forever after. The FTAIA's opening clause makes clear that such restraints on domestic and import commerce are subject to the Sherman Act.

Second, even if viewed as "wholly foreign" commerce, these restraints would be subject to the FTAIA's domestic-effects exception because plaintiffs' injuries are "inextricably bound up with" defendants' restraints on domestic and import commerce. *F. Hoffmann-La Roche Ltd. v. Empagran*, 542 U.S. 155, 164 (2004). Plaintiffs allege that these cross-border sports leagues conspired to restrain cross-border trade and prevented players from freely marketing their services and engaging with American teams. Unlike in *Empagran*, it would be impossible in this context to isolate certain harms as relating solely to Canadian conduct or commerce given the interrelated effects of defendants' actions across these tightly coordinated cross-border operations.

23

**III.**  Finally, considerations of adjudicative comity provide no basis for dismissing claims expressly authorized by the FTAIA and Clayton Act § 12, and the district court abused its discretion in concluding otherwise. Where statutes expressly authorize U.S. courts to apply U.S. law, courts have a "virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where [abstention] would clearly serve an important countervailing interest."  *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (alteration and quotation marks omitted).  That obligation applies with special force here given that the Supreme Court already applied principles of international comity and weighed the possible interference with foreign affairs in interpreting the FTAIA.  *Empagran*, 542 U.S. at 159.  With respect to Sherman Act claims that are allowed by the FTAIA, Congress has unambiguously directed the federal courts to take personal jurisdiction over corporate defendants "wherever [they are] found."  15 U.S.C. § 22.  The district court failed to give due consideration to Congress's choice or to acknowledge that Congress and the Supreme Court already accounted for international comity in drafting and interpreting the FTAIA.

Considerations of adjudicative comity in any event favor the exercise of jurisdiction here. Plaintiffs allege that defendants—many of them U.S. entities—intentionally targeted the entirety of the U.S. market, and those actions predictably injured thousands of hockey players who live in the United States or play (or could have played) for U.S.-based teams. Concerns about Canadian policy choices implicate prescriptive comity, not adjudicative comity, and the policy decision that matters here is Congress's explicit choice about the Sherman Act's territorial reach. There is no adequate forum for these Sherman Act claims in Canada, nor is there any suggestion that U.S. courts would undermine foreign relations by deciding them. The district court's contrary holding was based on a misunderstanding of the relevant inquiry and a false impression that "[p]laintiffs have not alleged that there is explicit purpose to harm or affect American commerce." 1-ER-68 (quotation marks omitted). In fact, plaintiffs expressly alleged such purpose and effect, and defendants' cross-border restraints were plainly intended to affect U.S. players, teams, and commerce.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal for lack of personal jurisdiction and for failure to state a claim. *LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122, 1124 (9th Cir. 2024); *D'Augusta v. American Petroleum Inst.*, 117 F.4th 1094, 1100 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1478 (2025). When conducting this review, the Court accepts all nonconclusory factual allegations in the complaint as true. *See D'Augusta*, 117 F.4th at 1100. The Court reviews a district court's international-comity determination for abuse of discretion and will reverse if the district court applied an incorrect legal standard or if its "application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in the inferences that may be drawn from the facts in the record." *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 566 (9th Cir. 2020) (quotation marks omitted).

## ARGUMENT

### I. Personal Jurisdiction Over the Eastern League Defendants Under the Clayton Act Is Consistent with Due Process.

#### A. *Fuld* easily supports personal jurisdiction over the Eastern League defendants.

Plaintiffs have met their burden of making a prima facie showing of jurisdictional facts establishing the Court's personal jurisdiction over all defendants. *See In re Western States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015). To satisfy this standard, a plaintiff must show that a statute confers jurisdiction and that the exercise of jurisdiction comports with due process. *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004). In applying that standard at this procedural stage, the Court draws all reasonable inferences in plaintiffs' favor. *In re Western States*, 715 F.3d at 741. Because personal jurisdiction as to the CHL, the Western League defendants, and most Central League defendants is undisputed, this discussion concerns only the Eastern League and its teams. *See supra* n.2.

Defendants concede that the Eastern League defendants are corporations subject to Clayton Act § 12, which provides that an antitrust

suit against a corporation may be brought "in any district wherein it may be found or transacts business; and all process in such cases may be served . . . wherever it may be found." 15 U.S.C. § 22. This Court has interpreted § 12's service-of-process provision "to grant personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation" sufficient to satisfy due process. *D'Augusta v. American Petroleum Inst.*, 117 F.4th 1094, 1100 n.1 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1478 (2025).

Defendants disputed whether the Eastern League and its teams had the required minimum contacts with the United States, and the district court held that they did not. 1-ER-23 & n.6. But that ruling predated the Supreme Court's decision in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), and accordingly applied the wrong standard. *Fuld* clarified that the jurisdictional limits imposed by the Fifth Amendment differ significantly from those imposed by the Fourteenth Amendment. *Id.* at 11-13. Before *Fuld*, courts applied a Fourteenth Amendment analysis in cases in which a federal statute authorized personal jurisdiction, asking whether the defendant has sufficient contacts with the relevant forum. *Id.* But *Fuld* held that the "interstate federalism concerns" underlying that Fourteenth Amendment analysis "do not apply to limitations under the

Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* at 15. Instead, the Fifth Amendment "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 16.

The *Fuld* Court declined to identify the outer limits of federal sovereign authority in this respect, expressly leaving open the possibility "that the Fifth Amendment imposes *no* territorial limits on personal jurisdiction." 606 U.S. at 18. But the Court found it sufficient that the statute in that case "tie[d] federal jurisdiction to conduct closely related to the United States that implicate[d] important" federal policy issues, placing it well within Congress's constitutional authority. *Id.* The Court approved on that basis the federal courts' jurisdiction over foreign defendants for acts of terrorism that harmed Americans abroad without assessing whether the defendants' contacts with the United States related to the cause of action. *See id.* The Court did not ask whether the defendants' conduct in connection with these terrorist attacks was directed at the United States, much less whether such harm was its sole aim.

29

The *Fuld* Court emphasized that the Fifth Amendment, unlike the Fourteenth Amendment, provides no "ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty." 606 U.S. at 15. As the Court explained, the federal government's authority reaches beyond its territorial boundaries to an extent not true of the States, and the authority of the federal courts likewise reaches foreign actors so long as the conduct is within the government's authority and relates to its legitimate interests. *See id.* at 15, 18.

While the federal interests here differ from *Fuld*, federal authority in this area is similarly well established. There is no dispute about Congress's authority to regulate anticompetitive foreign conduct that is directed at or affects the United States. Courts "have long held that application of our antitrust laws to foreign anticompetitive conduct is . . . reasonable . . . insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused." *F. Hoffmann-La Roche Ltd. v. Empagran*, 542 U.S. 155, 165 (2004). And the FTAIA confirms Congress's intention to regulate foreign conduct that affects U.S. commerce

while excluding from the Sherman Act's reach much foreign conduct that causes only foreign injury. *See id.* at 159.

Clayton Act § 12 in turn predicates personal jurisdiction on asserting a Sherman Act claim that survives the FTAIA. Accordingly, like the jurisdiction-conferring statute in *Fuld*, the operative statutes here "tie[] federal jurisdiction to conduct closely related to the United States." 606 U.S. at 18. That suffices to confirm the appropriateness of jurisdiction over the Eastern League defendants. The fact that these defendants—like those in *Fuld*—have "decades of meaningful contacts, ties, and relations with the United States," *id.* at 22 (quotation marks omitted), further cements that conclusion. *See infra* pp. 32-37.

*Fuld* held open the possibility that the Fifth Amendment might also entail an "inquiry into the reasonableness of the assertion of jurisdiction in the particular case," taking into account "the burden on the defendant, the interests of the forum . . . , and the plaintiff's interest in obtaining relief." 606 U.S. at 23-24. Even assuming such an inquiry is necessary, it is easily satisfied here. As in *Fuld*, the conclusion that "the forum sovereign has a substantial interest in adjudicating the dispute" follows from the close connection between defendants' conduct and U.S. commerce that the

31

FTAIA requires.  *Id.* at 24.  And defendants cannot plausibly "complain of any lack of notice or contend that litigating these cases in the United States would force them to bear an unfair or unmanageable burden" given their substantial and intentional actions with respect to that forum.  *Id.*  Under these circumstances, it cannot be said that § 12's "jurisdictional rule makes litigation so gravely difficult and inconvenient as to render the exercise of personal jurisdiction unreasonable and unfair."  *Id.* at 25 (cleaned up).

The district court did not have the benefit of *Fuld* in assessing personal jurisdiction with respect to the Eastern League defendants.  The Supreme Court had not previously identified the significant differences between the Fifth and Fourteenth Amendments in this respect, and the district court accordingly did not take them into account.  *Fuld* makes clear that, because the relevant statutes "tie[] federal jurisdiction to conduct closely related to the United States that implicates" U.S. interests, the exercise of jurisdiction in these circumstances is fully consistent with the Fifth Amendment.  606 U.S. at 18.

32

### B. Jurisdiction over the Eastern League defendants would also be constitutional under a pre-*Fuld* analysis.

1. While *Fuld* makes jurisdiction straightforward in these circumstances, the Court would also have jurisdiction over the Eastern League defendants under the Fourteenth Amendment's minimum-contacts analysis. Under that inquiry, a defendant has sufficient contacts to support jurisdiction if it committed an intentional act expressly aimed at the United States that predictably caused harm in that forum, and the exercise of jurisdiction is reasonable. *See Briskin v. Shopify, Inc.*, 135 F.4th 739, 750-51 (9th Cir. 2025) (en banc).

Like the Western and Central League defendants, the Eastern League defendants purposely directed their activities at the United States by entering into and implementing the challenged agreement to give each league exclusive control over a particular U.S. region and its players, and by annually recruiting players in the United States. The Eastern League defendants' "intentional, and allegedly [anticompetitive], actions . . . expressly aimed at" the United States provide a sufficient basis for jurisdiction. *Calder v. Jones,* 465 U.S. 783, 789 (1984). That the agreement also applied to Canada does not negate the fact that defendants

intentionally targeted the United States. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984).

Defendants knew the agreement's deliberate restraints on trade would injure players in the United States as they marketed their services and sought developmental opportunities. Defendants explicitly divided up the U.S. market, including by prohibiting U.S. players living in the western or central parts of the United States from marketing their services to the Eastern League—and vice versa. Accordingly, when American hockey player Isaiah DiLaura was 13 and starting to get recruited, "only scouts for the [Western League] could talk to [him] and [his] family since [his home in] Minnesota was not in the boundaries of the other major junior leagues." 2-ER-88. As a result of defendants' agreement, DiLaura "knew [he] wasn't going to be scouted by" the many Central or Eastern Leagues teams that were closer to his home. 2-ER-89. And causing this anticompetitive harm to DiLaura was entirely the point: By agreeing not to scout players like DiLaura, the Eastern League defendants intentionally conspired to restrain competition for U.S. talent, enriching the leagues at the players' expense.

34

As a result of these competitive restraints, DiLaura was drafted without his consent by Prince George—a club located 1,700 miles from his home. DiLaura was then put on the team's protected player list, which barred him from having contact with any other teams unless Prince George chose to trade him. 2-ER-89. DiLaura has detailed the difficult and exploitive circumstances that followed, leaving him far from home at age 16 with a stipend insufficient to cover even the cost of the gas needed to drive to mandatory practices. 2-ER-90-92. DiLaura "was only allowed one visit home to see [his] parents" for a few days each season. 2-ER-92. And when he asked to be traded to a team that would give him more playing time, DiLaura was "penalized for asking and benched for two months." *Id.* He "had no choice but bear this because" he "couldn't leave Prince George without jeopardizing his hockey career, and [he] personally couldn't talk to any other teams to ask for a trade." *Id.* Plaintiff Tanner Gould—a Canadian player who played for both American and Canadian teams—attested to similar harms. 2-ER-78-87.

The Eastern League defendants expressly agreed not to compete for DiLaura's and Gould's services—and those of countless other Western Central League players—in exchange for the exclusive right to recruit and

35

draft players within the Eastern League's territory, which includes several States, thereby reducing the market for those services and substantially limiting plaintiffs' opportunities. American players within the Eastern League's territory suffered similar consequences: Because they could be recruited only by Eastern League teams, their choice of where and how to offer their services was highly constrained. Indeed, defendants' anticompetitive scheme barred American players within the Eastern League from playing on any U.S. teams at all.

These impacts on American players are not incidental. Defendants' agreement divides the United States and Canada into exclusive territories precisely to accomplish these results and is thus "intentionally directed at [U.S.] resident[s]." *Calder*, 465 U.S. at 790.

2. In concluding that this conduct was insufficient to support jurisdiction over the Eastern League defendants, the district court relied on the fact that "the challenged agreements were directed at Canada and the United States jointly, not at the United States alone." 1-ER-27. But the minimum-contacts analysis entails an absolute inquiry, not a comparative one. The idea that a course of conduct must be aimed exclusively, or even predominantly, at a given forum to support jurisdiction was not correct

36

even before *Fuld*. That the conduct giving rise to the action was directed in part at the forum and predictably harmed plaintiffs there should have sufficed to support jurisdiction.

The Fourteenth Amendment's minimum-contacts inquiry looks to the deliberateness of the defendant's forum contacts and their relationship to the suit rather than comparing the quantity of forum contacts to the defendant's contacts elsewhere. Accordingly, the injurious conduct giving rise to jurisdiction need not be primarily directed to or felt in one forum to be sufficient there. In *Keeton*, a non-resident plaintiff filed suit in New Hampshire against a non-resident defendant alleging that she was libeled by statements in issues of the defendant's magazine that were circulated throughout the country. 465 U.S. at 772. The Supreme Court found the defendant's contacts with New Hampshire sufficient to support jurisdiction "even though only a small portion of th[e] copies" of the offending magazine were circulated there, *id.* at 775, and "the bulk of the harm done to [the plaintiff] occurred outside" the State, *id.* at 780.

The Court rejected the concern that "the New Hampshire tail is too small to wag so large an out-of-state dog," *Keeton*, 465 U.S. at 772, explaining that "[t]here is no unfairness in calling [the defendant] to

answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed," *id.* at 781. Accordingly, "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc).

Defendants' conduct in this case was intentionally "directed at Canada and the United States jointly," 1-ER-26, and a substantial share of the resulting harm was predictably felt in the United States. Indeed, the competitive harm felt by young hockey players throughout the United States as a result of defendants' conduct was not only predictable, it was the point. As in *Keeton*, it is enough that plaintiffs are "suing, at least in part, for damages suffered in" the United States as a result of defendants' actions toward that forum. 465 U.S. at 776; *see Calder* 465 U.S. at 789, 791 (upholding personal jurisdiction in California where an injurious article written in Florida and circulated throughout the country was "calculated to cause injury to" the plaintiff in that State).

II.     **The FTAIA Allows All of Plaintiffs' Claims.**

The FTAIA establishes the Sherman Act's territorial reach.  While it generally exempts from suit "conduct involving trade or commerce . . . with foreign nations," the statute's opening clause makes clear that this limitation does not apply to "conduct involving" domestic commerce or imports to the United States.  15 U.S.C. § 6a; *see Empagran*, 542 U.S. at 161 (finding that FTAIA applies to business arrangements that "affect only foreign markets").  Even as to wholly foreign, non-import commerce, the FTAIA preserves Sherman Act claims if the relevant conduct had a "direct, substantial, and reasonably foreseeable" effect on domestic or import commerce and that effect "gives rise to" those claims.  15 U.S.C. § 6a(1)-(2).

The district court correctly held that the FTAIA does not preclude plaintiffs' claims involving either American players or Canadian players allocated to American teams.  But the court erred in holding that the Act bars suit by Canadian players who were prevented by defendants' conduct from marketing their services to American teams and were consequently conscripted by Canadian teams.  The FTAIA allows suit in these circumstances both because defendants have restrained competition in domestic and import commerce and because the resulting harms to

39

Canadian players on Canadian teams are "inextricably bound up" with the defendants' cross-border conduct and the domestic effects of those restraints. *Empagran*, 542 U.S. at 171-72.

## A. Defendants' anticompetitive conduct involves U.S. domestic and import commerce.

Defendants do not contest the Sherman Act's applicability to claims brought by American and Canadian players on U.S. teams. That such claims may proceed follows straightforwardly from the FTAIA's opening clause, which makes the statute's limitations inapplicable to conduct involving domestic commerce or imports to the United States. 15 U.S.C. § 6a. An American player harmed by his experience with an American team raises a concern about domestic commerce. And a Canadian player harmed by the terms on which he is drafted or employed by an American team likewise alleges harms suffered in domestic and import commerce.

The district court erred, however, in concluding that the statute's opening clause does not allow the claims of American and Canadian players allocated to Canadian teams. Although the court ultimately concluded (correctly) that the FTAIA's domestic-effects exception allows the claims of American players on Canadian teams, 1-ER-59-61, it did not

reach the more straightforward conclusion that defendants' restraints on those players involve domestic commerce and thus fall outside the scope of the FTAIA. And the court further erred in holding that the FTAIA bars the claims of Canadian players allocated to Canadian teams because they purportedly arise from "wholly foreign conduct" that "can be isolated from the other claims in [the] case." 1-ER-54. The court's focus on "the alleged undercompensation of players in Canada pursuant to anticompetitive agreements enacted among Canadian entities," 1-ER-55, improperly narrows plaintiffs' allegations and is at odds with the court's acknowledgment that plaintiffs allege "a conspiracy to restrain trade for the services of foreign and domestic hockey players, whom Defendants scouted, recruited, and employed both ways across the United States/Canada border," 1-ER-53.

Canadian players allocated to Canadian teams suffer harms as a result of defendants' restraints on U.S. commerce that are wholly separate from the harms arising from their coerced contractual arrangement with their Canadian team. The primary restraints here are defendants' agreements to divide up North America to avoid competition and to conduct drafts that require players to deal exclusively with a single team.

41

The potential effect of these restraints on players' transactions with the teams that ultimately draft them is only one of the forms of antitrust injury that plaintiffs allege. Other injuries to these players are felt before they are drafted, when defendants' agreements prevent them from engaging with many, otherwise available American teams. Indeed, players residing in Eastern League territory are barred from marketing their services to any U.S. team at all. Players are also injured long after the draft, when defendants' conduct precludes them from pursuing opportunities with any of the remaining 59 teams (including U.S. teams), or from seeking to engage in commerce with the teams in the U.S.-based American Hockey League and East Coast Hockey League. *See supra* p. 12.

Defendants' anticompetitive conduct deprives these young prospects of opportunities for development, growth, and media exposure on the U.S. teams that may be most suited to their aims. And these measures deprive players of the chance to consider work in the U.S. cities and towns that best fit their individual needs, at any stage of their major junior careers. As the experiences of plaintiffs DiLaura and Gould demonstrate, *supra* pp. 13-14, these restrictions can do enormous damage to a young man's life and

career that is wholly separate from the adequacy of his financial compensation.

Accordingly, the district court's focus on the contractual "transaction" between a Canadian player and the Canadian team that drafted him ignores the restraints on competition that are felt both before and after that transaction, including the market allocation and player drafts that deprive these Canadian players of competition from U.S.-based teams. By improperly limiting plaintiffs' allegations and focusing solely on the harms felt when Canadian players are made to sign with their drafting Canadian team, the district court incorrectly concluded that these players' claims were caused by restraints that occurred only in Canada. When the allegations are considered in full, plaintiffs have clearly pleaded that the injuries to Canadian players arise in significant part from restraints on U.S. commerce. That means the relevant restraints are not "wholly foreign," *Empagran*, 542 U.S. at 163, and the FTAIA does not apply.

The conclusion that defendants' anticompetitive conduct restrains domestic or import commerce is particularly obvious as applied to American players allocated to Canadian teams, as the district court correctly found. Defendants' conduct deliberately restricts the ability of

43

U.S. players to market their services to teams in their home country. Indeed, for American players living in Eastern League states, defendants' agreement precludes the marketing of their services to any U.S. team whatsoever. The FTAIA provides no basis to think that Congress wanted to entrust the protection of these players' rights to the laws of a foreign nation (which, as alleged, offers no protection in these circumstances).

The same conclusion applies to Canadian players allocated to Canadian teams. For them, too, defendants' conduct directly constrains their ability to compete for positions on American teams, thus interfering with domestic commerce and the importation of player services to the United States. The FTAIA makes clear that when a restraint operates on a "good or service . . . being sent directly into the United States," defendants should expect U.S. law to apply regardless of whether the plaintiff can prove a further domestic effect. *Minn-Chem, Inc. v. Agrium Inc*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc). Here, defendants willfully restrained the importation of hockey services by limiting the recruitment of Canadian players by U.S. teams and by prohibiting Canadian players drafted onto Canadian teams from engaging with any U.S. alternatives (other than at the election of the drafting club). The FTAIA's text makes no distinction

44

between domestic and import commerce, and there should thus be no distinction here between the restraints on American and Canadian players who are barred from commerce with U.S. teams.

The district court missed this conclusion by focusing only on the contractual relationship between a player and his Canadian team. While that specific transaction may appear to be Canadian, defendants' broader course of conduct—and the harms resulting from that conduct—plainly operate in domestic or import commerce so as to fall outside the FTAIA. Protecting U.S. domestic and import commerce against such anticompetitive meddling is the ordinary business of U.S. law, and the FTAIA expressly allows these Sherman Act claims to proceed.

**B.** **Plaintiffs' injuries are a direct, substantial, and reasonably foreseeable consequence of the effects of defendants' conduct on U.S. domestic and import commerce.**

1. Even if the restraints at issue were thought to affect only foreign commerce, the statute's domestic-effects exception would allow plaintiffs' claims. The district court itself correctly held as much with respect to American players allocated to Canadian teams. The court explained that "the reason [these players] play in Canada is because they were scouted and recruited in the United States to play on teams and in locations that

45

they did not choose—and the fact that players cannot choose where to play is part of the injury alleged by Plaintiffs." 1-ER-59. "It is the recruitment (or restrictions on recruitment) in the United States of players that proximately caused those players' foreign injury, because without such recruitment, those players would not have signed [agreements] with Canadian teams . . . ." 1-ER-60. These American players' injuries are thus a direct, substantial, and reasonably foreseeable consequence of the effect that defendants' restraints have on domestic commerce, and the FTAIA confirms that Congress intended U.S. law to address such harms.

The same conclusion should follow for Canadian players, who participate in the same integrated market for major junior hockey services and are subject to the same cross-border restraints. The same "restrictions on recruitment[] in the United States" that prevent American players from marketing their services to the full range of U.S. teams (or to any teams once they are drafted) likewise prevent Canadian players from freely marketing their services to those same teams. As with American players, many Canadian players would prefer to play in the United States. But, as with American players, defendants' anticompetitive restraints often lead Canadian players to be drafted to places they did not choose and from

46

which they have no means of extricating themselves because the terms of the draft and the standard player agreement prevent them from marketing their services to any other team. Those injuries result from the same anticompetitive restraints and the same effects on domestic and import commerce as the injuries to the American plaintiffs.

As this Court and others have made clear, the question under the FTAIA is not the location of the injury (whether foreign or domestic), but whether that injury is proximately caused by a domestic effect on U.S. commerce. *See, e.g.*, *In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d 981, 987 (9th Cir. 2008) *(DRAM)*. Here, the domestic effects include "restrictions on recruitment" of these players into the United States, and the injury to these players results in substantial part from the agreements' restrictive effect on U.S. commerce.

The facts of *Caribbean Broadcasting System v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998), illustrate the FTAIA's application in similar circumstances. Although *Caribbean Broadcasting* predates the Supreme Court's decision in *Empagran*, the D.C. Circuit subsequently affirmed its holding and explained that "the FTAIA permitted [the plaintiff's] Sherman Act claim" to proceed in that case even though it "involved solely foreign

injury." *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1270 (D.C. Cir. 2005) (*Empagran II*). "There the plaintiff broadcaster, Caribbean, which operated an FM radio station based in the British Virgin Islands, filed an antitrust action against a competing FM radio station . . . alleging that the defendants had violated the Sherman Act by preserving the defendant station's radio broadcast monopoly in the eastern Caribbean region through, *inter alia*, misrepresentations to its advertisers regarding the station's broadcasting reach." *Id.*

The D.C. Circuit found "the requisite effect of the defendants' conduct on domestic trade or commerce" in those circumstances because the defendant's misrepresentations caused U.S. advertisers to pay the defendant station excessive prices for advertising. *Empagran II*, 417 F.3d at 1270. And the court explained that "[i]t was this effect of the defendants' monopolizing conduct—forcing U.S. businesses to pay for advertising on the defendant station—that caused Caribbean to lose revenue because it was unable to sell advertising to the same U.S. businesses." *Id.* (citing *Caribbean Broadcasting*, 148 F.3d at 1087). Similarly here, even if Canadian players on Canadian teams are thought to suffer a foreign injury, that injury arises from the direct effect of defendants' conduct on domestic and

48

import commerce—namely, the deliberate limitations that defendants placed on U.S. teams in recruiting and drafting these players.

2. The district court correctly held that "the recruitment of [American] players in the United States pursuant to anticompetitive agreements and geographical restrictions is a domestic effect of Defendants' conduct" such that the FTAIA allows their claims even if "those players' [resulting] underpayment in Canada" is a foreign injury. 1-ER-59. The court explained that, "for players from the United States who play for and are employed by Canada-based Clubs, the reason that they play in Canada is because they were scouted and recruited in the United States to play on teams and in locations that they did not choose—and the fact that players cannot choose where to play is part of the injury alleged by Plaintiffs." *Id.*

But while the court acknowledged that "this recruitment and resulting injury . . . occurs simultaneously to the recruitment (and resulting injury) of players from Canada," it erroneously held that the FTAIA bars the claims of Canadian players allocated to Canadian teams because they "are foreign employees of foreign employers whose injury was suffered independently of any domestic effect of those same foreign employers'

49

anticompetitive conduct in the United States." 1-ER-60. The court's premise that Canadian players on Canadian teams "operate[] wholly separately from domestic U.S. commerce," 1-ER-56, is at odds with the complaint's allegations and the court's other statements acknowledging the integrated, cross-border nature of this market, *see, e.g.*, 1-ER-52-53, 59-60, 68. And it elides the fact that the harms suffered by American and Canadian players in Canada are "inextricably bound up with" the domestic effects of defendants' anticompetitive conduct. *Empagran*, 542 U.S. at 171-72 (quotation marks omitted).

In holding that the domestic-effects exception does not apply to Canadian players on Canadian teams, the district court relied on a line of inapposite price-fixing cases. Citing *Empagran* and *DRAM*, the court noted that the domestic-effects exception has been found not to apply in cases alleging foreign price-fixing even when domestic price-fixing is also alleged because the separate foreign and domestic sales of the price-fixed good represent independent proximate causes of the foreign and domestic injuries. 1-ER-60. In those circumstances, courts have found that the anticompetitive conduct's "domestic effects did not help to bring about that foreign injury." *Empagran*, 542 U.S. at 175; *see DRAM*, 546 F.3d at 988.

But even the district court acknowledged that those price-fixing cases involved conduct that "was much more clearly wholly foreign than the conduct in this case," where plaintiffs "allege a conspiracy to restrain trade for the services of foreign and domestic hockey players, whom Defendants scouted, recruited, and employed both ways across the United States/Canada border." 1-ER-52-53.

Unlike in *Empagran*, the antitrust injuries alleged by American and Canadian players are not segregable by geography—Canadian players signed to Canadian teams allege harm resulting directly from agreements that precluded their ability to be recruited by, and play for, U.S. teams. "Defendants' anticompetitive conduct, as [alleged], was specifically aimed at the integrated North American market and, specifically, at each of the U.S. states which comprise inseverable parts of that market." 2-ER-236 (¶ 302). There is likewise no independence of causes here that can support a different outcome for U.S. and Canadian plaintiffs that have signed a standard player agreement with a Canadian team as a result of the same exclusionary effects on cross-border commerce. Indeed, it is defendants' anticompetitive agreements that determine whether a given Canadian player ends up playing on a U.S. or Canadian team. The harmful effects of

51

defendants' conduct are "felt simultaneously and interdependently on both sides of the border" and "are so inextricably intertwined that they cannot be segregated by geography." *Id.* Thus, unlike in *Empagram*, the challenged "conduct's domestic effects" absolutely "help[ed] to bring about that foreign injury." *Empagran*, 542 U.S. at 175.

The district court's attempt to distinguish between Canadian players drafted onto U.S. and Canadian teams as a result of defendants' conduct leads to nonsensical results. Imagine Canadian twins who want to play major junior hockey in Michigan but live on the Pacific coast and are drafted, respectively, by the Vancouver Giants and Seattle Thunderbirds. Both twins are deprived of the opportunity to market their services to their preferred U.S. team as a result of defendants' cross-border agreements, and both are subjected to the same low pay and harsh conditions by the same standardized contracts. Yet, according to the district court, whether a given twin can sue in the United States depends entirely on the happenstance of whether the twin was drafted by the Vancouver or Seattle team—even though the twins had no say in that decision and were subjected to the same harms from the same anticompetitive conduct.

At the end of the day, this case concerns a single North American market for elite hockey talent that defendants have divided along longitudinal lines into territories that cover both countries. Defendants' manifestly anticompetitive behavior in restricting competition among teams extends inextricably across the U.S.-Canadian border and subjects players to the same harms regardless of the country where they start out or end up. The same unlawful conduct gives rise to the same harms in both countries—not because of possible arbitrage or some other indirect effect, *see Empagran*, 542 U.S. at 175, but because defendants conspired to subject every elite hockey prospect in North America to the same league-wide rules and restraints. To label any portion of that system or its effects "independently" American—and to conclude that the FTAIA allows claims as to only that portion of defendants' conduct—is both logically impossible and utterly disconnected from the actual cross-border mechanisms through which plaintiffs are harmed.

III. **Considerations of International Comity Do Not Support the Dismissal of Claims that Congress Determined Should Be Adjudicated Under U.S. Law by U.S. Courts.**

1. The district court's dismissal of plaintiffs' Sherman Act claims "arising from injury suffered by players in the United States and players recruited from the United States," 1-ER-61, fundamentally misapprehends the doctrine of international comity. Congress has carefully delineated the foreign scope of U.S. antitrust law, balancing the importance of antitrust enforcement with concerns of foreign interference. The FTAIA confirms that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993). And Clayton Act § 12 reflects Congress's further judgment that a foreign corporate defendant may be subjected to suit in federal court for such violations "wherever [that defendant] may be found." 15 U.S.C. § 22. Together, these provisions reflect Congress's judgment that Sherman Act claims involving certain foreign conduct should proceed in federal court.

In general, two forms of international comity may affect a court's consideration of claims touching on foreign commerce. Legislative or prescriptive comity directs courts to "construe[] ambiguous statutes to

54

avoid unreasonable interference with the sovereign authority of other nations." *Empagran*, 542 U.S. at 164. And adjudicative comity asks whether a U.S. court should decline to exercise jurisdiction "when [a] case is pending in a foreign court with proper jurisdiction." *Mujica v. AirScan Inc.*, 771 F.3d 580, 599 (9th Cir. 2014); *see Vertiv, Inc. v. Wayne Burt PTE, Ltd.*, 92 F.4th 169, 176 (3d Cir. 2024) ("Adjudicatory comity arises only when a matter before a United States court is pending in or has resulted in a final judgment from a foreign court—that is, when there is or was a 'parallel' foreign proceeding.").

Critically, in the case of antitrust claims, the FTAIA and Clayton Act § 12 already account for the potential interference of U.S. law with foreign commerce. The *Empagran* Court recognized that the application of U.S. antitrust laws to foreign conduct "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." 542 U.S. at 165. The Court applied principles of prescriptive comity to bar antitrust claims alleging foreign conduct that "causes independent foreign harm" that "alone gives rise to the plaintiff's claim," explaining that "the justification for that interference" with foreign sovereignty "seems insubstantial." *Id.* at 165-66 (emphases omitted). But

the Court confirmed that, notwithstanding the risk of such interference, "application of our antitrust laws to foreign anticompetitive conduct is . . . reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *Id.* at 165.

Prior to *Empagran*, the Supreme Court suggested that "in a proper case a court may decline to exercise Sherman Act jurisdiction over foreign conduct." *Hartford Fire*, 509 U.S. at 798. But the Court in fact did the opposite in that case, exercising Sherman Act jurisdiction over London reinsurers who had allegedly engaged in unlawful conspiracies abroad to affect the market for insurance in the United States. *See id.* at 796, 799. And defendants have cited no case before or since in which a court has declined to address Sherman Act claims allowed by both the FTAIA and the Clayton Act. *Cf. Timberlane Lumber Co. v. Bank of Am.*, 549 F.2d 597, 615 (9th Cir. 1976) (reversing dismissal on comity grounds in a pre-FTAIA case notwithstanding that "most of the activity took place in Honduras" and "the most direct economic effect was probably on Honduras" given that there was "no indication of any conflict with the law or policy of the Honduran government").

56

Even outside the antitrust context, "rarely have United States courts abstained from deciding the merits of a case on international comity grounds" in the absence of a "true conflict[], a judgment from a foreign court, or [a] parallel proceeding[] in a foreign forum," *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 393 (3d Cir. 2006)—none of which is asserted here. That infrequency reflects the courts' "virtually unflagging obligation to exercise their jurisdiction except in those extraordinary circumstances where [abstention] would clearly serve an important countervailing interest." *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (alteration and quotation marks omitted).

"Both this court and the Supreme Court have long affirmed that '[d]istrict courts have an obligation and a duty to decide cases properly before them.'" *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 926 (9th Cir. 2024) (quoting *City of Tucson v. United States W. Commc'ns, Inc.*, 284 F.3d 1128, 1132 (9th Cir. 2002)). Accordingly, "[a]bstention is generally permitted only in 'exceptional circumstances,' when 'denying a federal forum would clearly serve an important countervailing interest.'" *Id.* (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). This

general obligation to exercise jurisdiction "is not diminished simply because foreign relations might be involved." *Gross*, 456 F.3d at 393.

Because the Supreme Court has already determined as a matter of prescriptive comity that the United States' interest in redressing certain harms is sufficient to justify the "risk of interference with a foreign nation's ability independently to regulate its own commercial affairs," *Empagran*, 542 U.S. at 165, courts need not reweigh the risk of foreign interference as a matter of adjudicative comity. The district court applied the wrong standard—and thus abused its discretion—in doing so. 1-ER-68-69; *see Timberlane*, 549 F.2d at 615 (reversing the district court's dismissal of Sherman Act claims based on comity principles).

The district court asserted that "U.S. interests weigh against hearing cases where doing so would be harmful to U.S. foreign policy," 1-ER-68 (quoting *Mujica*, 771 F.3d at 606), and it concluded that "this factor weighs in favor of abstention" in this case, 1-ER-69. But the Supreme Court expressly considered that risk as a matter of prescriptive comity in construing the FTAIA, and the district court correctly concluded that the FTAIA allows the Sherman Act claims of American players and players allocated to U.S. teams. The court thus abused its discretion in holding that

58

factors that are properly considered as part of the prescriptive comity analysis—and that confirm the court's jurisdiction—somehow weigh in favor of dismissal as a matter of adjudicative comity here.

The court went even further astray in identifying and deferring in these circumstances to a Canadian public policy choice not to provide a parallel antitrust claim. *See* 1-ER-68-69. As an initial matter, that is a consideration of prescriptive comity, not adjudicative comity, *see Empagran*, 542 U.S. at 164-66, and the court abused its discretion in applying the wrong analysis. But even putting that aside, deference to that Canadian policy choice is particularly improper when Congress expressed through the FTAIA its own policy choice that U.S. law should apply and provide the players with a cause of action in these circumstances.

Were all that not enough, there is also Clayton Act § 12. In this context, Congress has not only taken international comity into account in prescribing the territorial reach of the Sherman Act, it has also specifically authorized U.S. courts to exercise jurisdiction over these claims wherever the defendant may be found. 15 U.S.C. § 22. Congress has thus weighed in directly on the questions of both prescriptive and adjudicative comity, and the district court's analysis fails to acknowledge those choices.

59

2.  In any event, the considerations that inform the application of adjudicative comity in other cases provide no basis for dismissing plaintiffs' claims—particularly those that "aris[e] from injury suffered by players in the United States and players recruited from the United States" and thus have emphatically domestic elements.  1-ER-61.  Adjudicative comity directs courts presented with parallel foreign proceedings to consider "the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum."  *Cooper*, 960 F.3d at 566 (alterations omitted).  Here, the lack of "a judgment from a foreign court, or [a] parallel proceeding[] in a foreign forum," should suffice to end the inquiry.  *Gross*, 456 F.3d at 393; *see Vertiv*, 92 F.4th at 176; *Mujica*, 771 F.3d at 599.

Were more required, consideration of "(1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the [countries], and (5) any public policy interests" would only underscore the strength of the U.S. interest here and further weaken the argument for abstention.  *Mujica*, 771 F.3d at 604.  As discussed, defendants undertook a course of anticompetitive conduct that was deliberately aimed at both the United

States and Canada. The leagues' agreement expressly divides up the entirety of the United States—and all of the hockey players therein—for the purpose of limiting competition for those players. *See supra* pp. 8-10. Hundreds of putative class members are U.S. citizens or nationals, and multiple defendants are likewise based in the United States. *See Mujica*, 771 F.3d at 605 ("tak[ing] account of whether any of the parties are United States citizens or nationals" as part of the comity inquiry). Congress intended the Sherman Act to provide a means of redressing these harms. *See Empagran*, 542 U.S. at 165. And the FTAIA and Clayton Act § 12 codify the United States' interest in a domestic forum for addressing anticompetitive foreign conduct that substantially affects U.S. commerce.

There are no countervailing interests that warrant abstention in these circumstances. While many of the defendants are Canadian and their anticompetitive conduct also had effects in Canada, defendants' agreement intentionally targeted the broader North American market and allocated swaths of the United States and Canada to each league. Defendants were obviously aware of the impact their conduct would have on the United States. The fact that conduct deliberately affecting the United States also affects another country is not the type of extraordinary circumstance that

61

supports a decision not to exercise the jurisdiction granted by Congress. *See Gross*, 456 F.3d at 393.

The circumstances that have in other (non-Sherman Act) cases been found to support abstention based on adjudicative comity are not present here. In both *Cooper* and *Mujica*, the entirety of the injurious conduct occurred abroad, and in both cases the foreign forum was found adequate to adjudicate the plaintiffs' claims. *Cooper*, 960 F.3d at 567-69; *Mujica*, 771 F.3d at 609. Indeed, in *Mujica*, the plaintiffs had already received a favorable judgment in Colombia. 771 F.3d at 613-14. And the Court in *Cooper* observed that "Japan ha[d] committed a significant sum of money and resources to ensure fair and consistent compensation for accident victims," and that simultaneous adjudication of the claims in the U.S. could upset that process and ultimately undermine the interests the plaintiffs sought to vindicate. 960 F.3d at 568; *see JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) (explaining that adjudicative comity involves "the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction"). In addition, the Japanese government filed an amicus brief in *Cooper* "expressing a strong

interest in the case being litigated in Japan." 960 F.3d at 567-68. And in *Mujica* both the Colombian and U.S. governments urged that any further proceedings should occur in Colombia. 771 F.3d at 609, 611.

None of these circumstances is present here. Unlike in *Cooper* and *Mujica*, defendants' conduct was aimed squarely at the United States, and the Canadian government has not registered any objection to these proceedings. In addition, the proceedings brought in Canada under the Canadian Competition Act showed the forum to be inadequate because Canadian law does not provide a private cause of action for the type of anticompetitive conduct alleged here. *See Mohr v. NHL*, [2021] FC 488 (Fed. Ct. Can.) (holding that the Competition Act applies only to agreements regarding the "production or supply" of a product). While Canadian law was subsequently amended to provide a private cause of action to address conspiracies to "fix, maintain, decrease or control salaries, wages or terms and conditions of employment" or to make no-poach agreements, these amendments are limited to employer-employee relationships (which defendants deny are present here). Competition Act, R.S.C. 1985, c C-34 § 45(1.1) (2023). And the Act does not provide for injunctive relief. *Id.* § 88.

63

3. The district court abused its discretion in concluding that adjudicative comity requires dismissal of claims expressly authorized by the FTAIA and Clayton Act—particularly those that "aris[e] from injury suffered by players in the United States and players recruited from the United States." 1-ER-61. The court first erred in failing to recognize the relevance of *Empagran* and the Supreme Court's application of prescriptive comity in construing the FTAIA's scope. *See* 1-ER-22. By viewing this case as presenting only "a question of adjudicatory comity" and considering the risk of foreign interference under that framework, *id.*, the court's analysis improperly double-counted the foreign-policy considerations already accounted for by the scope of the FTAIA, 1-ER-68-69.

The district court's analysis was also premised on an erroneous view of the alleged conspiracy. The court counted the "character of the conduct" at issue as weighing in favor of abstention based on its conclusion that "the alleged conduct charged by Plaintiffs occurred predominantly in Canada, between Canadian entities." 1-ER-67. And the court asserted that, "of the claims that remain before the Court (*i.e.*, those claims arising from injuries sustained by players on teams based in the United States or by players on teams based in Canada, but who were recruited from the United States),

Plaintiffs have not alleged that 'there is explicit purpose to harm or affect American commerce.'" 1-ER-67-68.

Contrary to the district court's assertion, plaintiffs have expressly alleged that defendants intentionally directed their conduct at the United States and thereby harmed U.S. players and U.S. commerce. *See* 2-ER-139 (emphasizing that "[a]ll 50 U.S. states . . . are thus targeted by, are the subject of, and are directly affected by this per se illegal agreement"). That allegation is at the very heart of plaintiffs' case, and the court's contrary characterization that there was no "purpose to harm or affect American commerce," 1-ER-68, is simply incorrect. As discussed, the leagues expressly allocated to themselves the entirety of the United States and all of its elite hockey players in order to limit these players' opportunity to market their services. *See supra* pp. 8-12. It is hard to imagine a more explicit purpose to affect U.S. commerce. The fact that these claims also involve a concurrent intent to harm Canadian commerce does not undermine this U.S.-directed purpose or obviate the harms that defendants intentionally caused to U.S. players and to those on U.S. teams.

The district court fundamentally mischaracterized these allegations in stating that "asserting jurisdiction for a small group and allowing the

small group to potentially upend the conduct of business that mostly occurs in another country would be like the tail wagging the dog." 1-ER-68. The restraints that form the basis for the Court's jurisdiction are all dog. Defendants engaged in an integrated course of conduct that intentionally restrained U.S. as well as foreign commerce and intentionally affected both U.S. and Canadian players. The business conducted on either side of the border—and the harms that inevitably resulted—were part and parcel of the same collusion. It is the district court's attempt to view certain effects in isolation that would yield anomalous results, not plaintiffs' request that the Court consider defendants' integrated course of dealing.

For all of these reasons, "even assuming that in a proper case a court may decline to exercise Sherman Act jurisdiction over foreign conduct" based on principles of adjudicative comity, those principles do "not counsel against exercising jurisdiction in the circumstances alleged here," *Hartford Fire*, 509 U.S. at 798, and the district court abused its discretion in holding otherwise.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Respectfully submitted,

Jeffrey I. Shinder
Ethan E. Litwin
Tyler S. Ross
SHINDER CANTOR LERNER LLP
14 Penn Plaza, 19th Floor
New York, NY 10122
(646) 960-8601

J. Wyatt Fore
SHINDER CANTOR LERNER LLP
600 14th Street NW, 5th Floor
Washington, DC 20005
(646) 960-8612

Michael Rubin
Stacey Leyton
Bronwen O'Herin
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

November 12, 2025

*s/ Eric F. Citron*
Eric F. Citron
ZIMMER, CITRON & CLARKE LLP
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 796-4540
ecitron@zimmercitronclarke.com

Lindsey Powell
ZIMMER, CITRON & CLARKE LLP
345 W. Washington Ave. #300
Madison, WI 53703
(608) 394-6750
lpowell@zimmercitronclarke.com

James R. Martin
Jennifer Duncan Hackett
ZELLE LLP
1775 Pennsylvania Ave. NW
Suite 375
Washington, DC 20006
(202) 899-4101

Judith A. Zahid
Sarah Van Culin
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
(415) 693-0700

## STATEMENT OF RELATED CASES

The undersigned counsel is not aware of any related cases currently pending in this Court.

_s/ Eric F. Citron_____
ERIC F. CITRON

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the page-limitation requirements of Ninth Circuit Rule 32-1(a) because it contains 13,101 words, exclusive of the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it was prepared in a proportionally spaced, 14-point Book Antiqua typeface using Microsoft Word.

*s/ Eric F. Citron*
ERIC F. CITRON

**ADDENDUM**

## TABLE OF CONTENTS

**<u>Page</u>**

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

15 U.S.C. § 6a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A2

15 U.S.C. § 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A3

**15 U.S.C. § 1 – Trusts, etc., in restraint of trade illegal; penalty**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**15 U.S.C. § 6a – Conduct involving trade or commerce with foreign nations**

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

   (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

   (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

**15 U.S.C. § 22 – District in which to sue corporation**

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.