No. 25-3929

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

WORLD ASSOCIATION OF ICEHOCKEY PLAYERS UNIONS NORTH
AMERICA DIVISION, ET AL.,

*Plaintiffs-Appellants*,

v.

NATIONAL HOCKEY LEAGUE, ET AL.,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
No. 2:24-cv-02135-TL
The Honorable Tana Lin, United States District Court Judge

**BRIEF OF STATES OF WASHINGTON, CALIFORNIA, COLORADO, DELAWARE, ILLINOIS, MARYLAND, MICHIGAN, MINNESOTA, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND THE DISTRICT OF COLUMBIA AS AMICUS CURIAE IN SUPPORT OF APPELLANTS**

NICHOLAS W. BROWN
Attorney General of Washington

CHRISTINA M. BLACK
VALERIE K. BALCH
MIRIAM R. STIEFEL
Assistant Attorneys General
Office of the Attorney General
Antitrust Division
800 Fifth Ave. Ste. 2000

Seattle, WA 98104
206-389-2174
Christina.Black@atg.wa.gov
Valerie.Balch@atg.wa.gov
Miriam.Stiefel@atg.wa.gov

*(Additional Amici on Signature Page)*

# TABLE OF CONTENTS

I. INTRODUCTION................................................................ 1

II. INTEREST OF AMICI ...................................................... 1

III. STATEMENT OF THE CASE ........................................... 3

    A. Background................................................................. 3

    B. Plaintiffs' Allegations.................................................. 4

    C. Procedural History ...................................................... 6

IV. ARGUMENT .................................................................... 8

    A. Taking the Complaint Allegations as True,
       Defendants' Market Allocation Agreement
       Harms Minors and Young Adults.............................. 8

        1. Market Allocation is Pernicious
           Anticompetitive Conduct that Violates the
           Sherman Act ........................................................ 8

        2. Dividing a Labor Market is Just as
           Anticompetitive as Dividing a Product
           Market.................................................................. 10

        3. Plaintiffs' Allegations, Taken as True, Show
           an Actionable Antitrust Violation ...................... 11

    B. Plaintiffs' Allegations Satisfy the "Express
       Aiming" and "Knowledge of the Harm" Prongs
       of the *Calder* Effects Test for the Eastern League
       Defendants ................................................................ 13

i

1. The Eastern League Defendants "Expressly Aimed" Their Conduct at the United States....... 15

2. The Eastern League Defendants Caused Harm in the United States and Knew Harm Would be Suffered Here...................................... 19

C. The District Court's International Comity Ruling Erred....................................................................... 20

1. The *Mujica* Test for Government Interests Does Not Favor Abstaining................................ 21

    a. The District Court Erred in Concluding Most Conduct Occurred in Canada.............. 22

    b. In Evaluating the Parties' Nationality, the District Court Erred by Including Dismissed Plaintiffs ..................................... 24

    c. In Analyzing the Character of the Conduct, the District Court Overlooked Allegations and Included Dismissed Claims ........................................................ 25

    d. The District Court Erred in Ruling Foreign Policy Interests Favored Abstention When Neither Country Requested Abstention ................................. 27

    e. The District Court Erred in Minimizing the U.S.'s Public Policy Interest in Enforcing Antitrust Violations on Behalf of Citizens and Residents........................... 29

2. The Foreign Forum Was Inadequate Because Labor Antitrust Violations Could Not Be Litigated............................................................... 31

V. CONCLUSION ................................................................. 34

iii

# TABLE OF AUTHORITIES

## Cases

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ........................................ 11, 26

*American Safety Equip. Corp. v. J. P. Maguire & Co.*,
391 F.2d 821 (2d Cir. 1968) ................................................ 30

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021) ................................................ 10

*Ayla, LLC v. Alya Skin Pty. Ltd.*,
11 F.4th 972 (9th Cir. 2021) ................................................ 18

*Berg v. CHL*,
[2019] ONSC 2106 (2019) (Can.),
https://canlii.ca/t/hzjhg........................................................ 13

*Bi v. Union Carbide Chems. & Plastics Co.*,
984 F.2d 582 (2d Cir. 1993) ................................................ 28

*Briskin v. Shopify, Inc.*,
135 F. 4th 739 (9th Cir. 2025) (en banc) ............ 13, 14, 17, 18

*Cole v. Tobacco Inst.*,
47 F. Supp. 2d 812 (E.D. Tex. 1999).................................... 31

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)............................................................. 20

*Cooper v. Tokyo Electric Power Company, Inc.*,
860 F.3d 1193 (9th Cir. 2017) ............................................. 32

*Cunard S.S. Co. v. Salen Reefer Serves. AB*,
773 F.2d 452 (2d Cir. 1985) ................................................ 30

*D'Augusta v. Am. Petroleum Inst.*,
117 F.4th 1094 (9th Cir. 2024) ............................................... 15

*Dependable Highway Exp. v. Navigators Ins. Co.*,
498 F.3d 1059 (9th Cir. 2007) ................................................ 30

*Doe I v. Cisco Sys., Inc.*,
73 F.4th 700 (9th Cir. 2023) ........................................... 27, 28

*E. & J. Gallo Winery v. Andina Licores S.A.*,
446 F.3d 984 (9th Cir. 2006) ................................................. 28

*Fourqurean v. Nat'l Collegiate Athletic Ass'n*,
143 F.4th 859 (7th Cir. 2025) ................................................ 10

*Fuld v. Palestinian Liberation Org.*,
606 U.S. 1 (2025).......................................................... 13, 14

*GDG Acquisitions, LLC v. Government of Belize*,
749 F.3d 1024 (11th Cir. 2014) ............................................. 28

*Gross v. German Found. Indus. Initiative*,
456 F.3d 363 (3d Cir. 2006) ................................................. 32

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
27 F. Supp. 3d 1002 (N.D. Cal. 2014).................................... 15

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012)................................... 17

*In re Ins. Antitrust Litig.*,
938 F.2d 919 (9th Cir. 1991), *aff'd in part, rev'd in part
on other grounds sub nom. Hartford Fire Ins. Co. v.
California*, 509 U.S. 764 (1993).......................................... 26

*In re Korean Ramen Antitrust Litig.*,
281 F. Supp. 3d 892 (N.D. Cal. 2017)................................... 24

v

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) ............................ 9, 12

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
630 F. Supp. 3d 968 (N.D. Ill. 2022) .................................. 10

*In re Simon*,
153 F.3d 991 (9th Cir. 1998) ................................ 20

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013) .......................... 15, 16

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
731 F.2d 909 (D.C. Cir. 1984) .............................. 30

*Lawson v. Klondex Mintes Ltd.*,
450 F. Supp. 3d 1057 (D. Nev. 2020) ............................ 24, 29

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) .............................. 32

*LyricFind, Inc. v. Musixmatch, S.p.A.*,
No. 25-cv-02265-JSC, 2025 WL 2537755 (N.D. Cal.
Sept. 3, 2025) .................................... 18

*Mohr v. NHL*,
[2021] F.C. 488 (Can.), https://canlii.ca/t/jh76v .................... 6

*Mohr v. NHL*,
[2022] F.C.A. 145 (Can.), https://canlii.ca/t/jrgrk ............ 6, 33

*Mujica v. AirScan Inc.*,
771 F.3d 580 (9th Cir. 2014) .................. 20, 21, 22, 25, 30, 32

*Nevada v. Bank of Am. Corp.*,
672 F.3d 661 (9th Cir. 2012) .............................. 2

*Northern Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958).................................................................. 8

*Ohio v. Nat'l Collegiate Athletic Ass'n*,
No. 1:23-cv-00100 (N.D. W. Va.) .......................................... 2

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
776 F.2d 185 (7th Cir. 1985) ................................................ 11

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
970 F.2d 552 (9th Cir. 1992) ................................................ 30

*Soundgarden v. Eikenberry*,
871 P.2d 1050 (Wash. 1994) (en banc) ................................. 2

*Ungaro-Benages v. Dresdner Bank AG*,
379 F.3d 1227 (11th Cir. 2004) ............................................ 28

*Union Lab. Life Ins. Co. v. Pireno*,
458 U.S. 119 (1982)............................................................. 29

*United States v. eBay, Inc.*,
968 F. Supp. 2d 1030 (N.D. Cal. 2013)................................. 10

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972)...................................................... 2, 8, 12

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
89 F.4th 430 (3d Cir. 2023) ............................................. 9, 12

## Statutes

15 U.S.C. § 1 ...................................................................... 4, 8

15 U.S.C. §§ 1–38 ................................................................. 2

15 U.S.C. § 6a ...................................................................... 26

15 U.S.C. § 22 ...................................................... 13, 14, 15, 18

WASH. REV. CODE § 19.86 ....................................................... 2

WASH. REV. CODE § 49.12.005(4)............................................ 4

WASH. REV. CODE § 49.46.010(4)(p)......................................... 4

Other Authorities

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2013) ....................................................... 11

Amicus Curiae Brief by the Attorney General of Washington, *Stigar v. Dough Dough, Inc.*, No. 2:18-cv-00244-SAB (E.D. Wash. Mar. 11, 2019) .............................. 2

Brian Callaci et al., *The Effect of Franchise No-poaching Restrictions on Worker Earnings*, SSRN (June 05, 2024), https://ssrn.com/abstract=4155577 ...................................... 10

Brief for the United States as Amicus Curiae, *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33 (2018) (No. 16-1220)....................................... 21

Decl. of Jeffrey I. Shinder in Supp. of Pls.' Mot. for Prelim. Inj., Ex. 3, *World Ass'n of Icehockey Players Unions N. Am. Div. v. NHL*, No. 2:24-CV-2135-TL (W.D. May 23, 2025), ECF No. 42-3 .............................. 5, 12

Decl. of Jeffrey I. Shinder in Supp. of Pls.' Mot. for Prelim. Inj., Ex. 4, *World Ass'n of Icehockey Players Unions N. Am. Div. v. NHL*, No. 2:24-CV-2135-TL (W.D. May 23, 2025), ECF No. 42-4 ................................. 12

H.R. Rep. No. 97–686 (1982), *reprinted in* 1982
  U.S.C.C.A.N. 2487 ................................................................ 26

Rochella T. Davis, *Talent Can't Be Allocated: A Labor
  Economics Justification for No-Poaching Agreement
  Criminality in Antitrust Regulation*,
  12 Brook. J. Corp. Fin. & Com. L. 279 (2018) ...................... 8

U.S. DOJ, Archived Antitrust Resources Manual
  (Nov. 2017),
  https://www.justice.gov/archives/jm/archived-antitrust-
  resource-manual ...................................................................... 9

William Weingarten, *Divined Comity: Assessing the
  Vitamin C Antitrust Litigation and Updating the Second
  Circuit's Prescriptive Comity Framework*,
  29 Fordham J. Corp. & Fin. L. 281 (2023).......................... 20

## I. INTRODUCTION

The district court's ruling underestimates the harm of market allocation agreements—some of the most pernicious antitrust violations—and makes it harder for state antitrust enforcers to litigate market allocation claims and protect their citizens and residents. Courts should not allow conspirators to escape liability because they targeted the U.S. *and* another country.

The States of Washington, California, Colorado, Delaware, Illinois, Maryland, Michigan, Minnesota, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, and Vermont, and the District of Columbia file this brief to explain the unintended consequences of affirming the district court. The Court should reverse the district court's ruling on personal jurisdiction regarding the Québec Maritimes Junior Hockey League ("Eastern League") and all Eastern League Clubs, as well as the ruling on international comity.

## II. INTEREST OF AMICI

Amici submit this brief under Federal Rule of Appellate Procedure 29(a) to ensure no one evades antitrust laws by making market allocation agreements transnational in scope.

Antitrust laws "are the Magna Carta of free enterprise" and "as important to the preservation of economic freedom and our free-enterprise

system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Courts recognize states' interests in enforcing antitrust laws and in "securing an honest marketplace and the economic well-being of their citizens." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 671 (9th Cir. 2012) (citation omitted). Amici also have an important interest in the welfare of their minors. *See, e.g.*, *Soundgarden v. Eikenberry*, 871 P.2d 1050, 1060 (Wash. 1994) (en banc).

As *parens patriae*, Amici are concerned that bad actors will be emboldened to engage in market allocation schemes if transnational schemes cannot be litigated here. Amici have a strong interest in the outcome of this case as enforcers of the Sherman Antitrust Act, 15 U.S.C. §§ 1–38, and state antitrust laws like the Washington Consumer Protection Act, WASH. REV. CODE § 19.86, which Amici have demonstrated records of enforcing to protect worker mobility.[1] Amici's interest in this case also arises from its impact on minors and young adults from their respective states whose rights this

---

[1] *See, e.g.*, Amicus Curiae Brief by the Attorney General of Washington at 1, *Stigar v. Dough Dough, Inc.*, No. 2:18-cv-00244-SAB (E.D. Wash. Mar. 11, 2019) (noting Washington State investigated over 100 nationwide franchisors with no-poach provisions in their franchise agreements, leading to successful resolutions); *Ohio v. Nat'l Collegiate Athletic Ass'n*, No. 1:23-cv-00100 (N.D. W. Va.) (antitrust enforcement action by multiple states, including several of the Amici, on behalf of student-athletes challenging school transfer rule).

agreement impairs but who cannot access a U.S. court to adjudicate their claims even though they reside here and anticompetitive conduct occurred here.

### III.   STATEMENT OF THE CASE

### A.   Background

The Major Junior Leagues are considered "the best professional hockey development leagues in the world" for players aged 16–20. 2-ER-144. There are three independent Leagues: the Western Hockey League ("Western League"), the Ontario Major Junior Hockey League ("Central League"), and the Québec Maritimes Junior Hockey League ("Eastern League"). 2-ER-193. The Canadian Hockey League ("CHL"), an umbrella organization, issues operational rules but is a separate legal entity. 2-ER-156, 2-ER-193.

Within each of the Leagues are franchises ("Clubs") that each operate a hockey team. *See* 2-ER-157, 2-ER-168, 2-ER-178. Each League schedules and operates its own games; establishes playing rules; organizes player drafts; and provides direction regarding players' agreements. 2-ER-138. Accordingly, as Plaintiffs allege, "cooperation among the Leagues (and their constituent Clubs) is not necessary for the product they produce, *i.e.* major junior hockey, to be available." *Id.*

3

Most of the 60 Clubs are based in Canada, but nine clubs are U.S.-based. 2-ER-138, 2-ER-193. All the U.S.-based Clubs belong to the Western or Central Leagues; all the Eastern League Clubs are in Canada. *See* 2-ER-193.

While a statutory exception in Washington renders Major Junior Hockey players non-employees for certain purposes,[2] the Leagues and Clubs demand that players approach Major Junior Hockey as a full-time job. 2-ER-194–95. "Major Junior players compete in professional-length schedules and devote at least a full 40-hour week to hockey, every week of the season." 2-ER-195.

## B. Plaintiffs' Allegations

Plaintiffs allege the Leagues, Clubs, and the CHL (collectively, the "Major Junior Defendants") allocated the hockey player market by creating exclusive geographic territories from which only one League may recruit and draft players, violating the Sherman Act, § 1. 2-ER-139, 2-ER-146–47. Plaintiffs allege the National Hockey League ("NHL") facilitated the conspiracy. 2-ER-138–39.

The alleged agreement allocates all U.S. states and Canadian provinces, with each belonging exclusively to one League, *see* 2-ER-139, as memorialized in CHL and League rules and regulations like the Central League Manager's

---

[2] WASH. REV. CODE §§ 49.12.005(4), 49.46.010(4)(p).

4

Manual. 2-ER-198. Washington is allocated to the Western League. 2-ER-157.

Other Amici states are allocated according to the excerpt from the Central

League Manager's Manual below.[3]

Case 2:24-cv-02135-TL    Document 42-3    Filed 01/16/25    Page 73 of 95

Case 1:24-cv-01086-NWG    Document 226-10    Filed 10/25/24    Page 73 of 95

400-14

**PROTECTED PLAYER AND FRANCHISE TERRITORIES**

1. Ontario Hockey League Protected Territories and States

| | |
|---|---|
| Ontario | Alabama |
| Arkansas | Delaware |
| Florida | Georgia |
| Illinois | Indiana |
| Iowa | Kentucky |
| Louisiana | Maryland |
| Michigan | Mississippi |
| Missouri | New Jersey |
| New York | North Carolina |
| Ohio | Pennsylvania |
| South Carolina | Tennessee |
| Virginia | West Virginia |
| Wisconsin | |

2. Quebec Major Junior Hockey League Protected Territories and States

| | |
|---|---|
| Quebec | New Brunswick |
| Nova Scotia | Connecticut |
| Newfoundland | Massachusetts |
| Maine | Rhode Island |
| New Hampshire | Vermont |
| PEI | |

3. Western Hockey League Protected Territories and States

| | |
|---|---|
| Manitoba | Saskatchewan |
| Alberta | British Columbia |
| Yukon | NWT |
| Alaska | Arizona |
| California | Colorado |
| Hawaii | Idaho |
| Kansas | Minnesota |
| Montana | Nebraska |
| Nevada | New Mexico |
| North Dakota | Oklahoma |
| Oregon | South Dakota |
| Texas | Utah |
| Washington | Wyoming |

Highly Confidential Outside Attorney's Eyes Only
DECLARATION OF JEFFREY I. SHINDER - 967
Case No. 2:24-CV-2135-TL

CHL-00001134

---

[3] Decl. of Jeffrey I. Shinder in Supp. of Pls.' Mot. for Prelim. Inj., Ex. 3, § 400-14, World Ass'n of Icehockey Players Unions N. Am. Div. v. NHL, No. 2:24-CV-2135-TL (W.D. May 23, 2025), (hereinafter "Shinder Decl."), ECF No. 42-3 (Excerpt from Central League Manager's Manual).

Plaintiffs allege all Clubs agreed to follow League Rules, and thus restricted their scouting, recruiting, and signing of players to residents within their exclusive territories. 2-ER-139. Clubs can therefore require players to sign contracts that:

- Pay significantly less than what comparable developmental hockey leagues pay;

- Require players to move to any location in their League (possibly internationally);

- Require players to surrender their name, image, and likeness; and

- Prevent players from leaving to play for another club unless the new club pays a transfer payment of up to $500,000.

*See* 2-ER-140, 2-ER-210–11, 2-ER-218, 2-ER-249.

## C. Procedural History

Major Junior Hockey players previously brought similar claims in Canada. The most similar litigation was dismissed without leave to amend. *See Mohr v. NHL*, [2021] F.C. 488 (Can.), https://canlii.ca/t/jh76v. The trial court ruled, and an appellate court affirmed, that the Canadian law at issue did not recognize labor antitrust violations. *See Mohr v. NHL*, [2022] F.C.A. 145 ¶¶ 34, 40–42 (Can.), https://canlii.ca/t/jrgrk.

Plaintiffs subsequently filed this case in the Western District of Washington. Defendants filed motions to dismiss, which the court granted on the following grounds:

- Personal jurisdiction for the Eastern League and all Eastern League Clubs (collectively, the "Eastern League Defendants"), two Central League Clubs, and the NHL;

- The Foreign Trade Antitrust Improvements Act ("the FTAIA") for some claims; and

- International comity for all remaining claims.

1-ER-74.

Plaintiffs appealed the dismissal of the Eastern League Defendants on grounds of personal jurisdiction, as well as the dismissal of claims under the FTAIA and international comity. Appellants' Opening Br. 3. Plaintiffs did not appeal the district court's determination that the Eastern League Defendants and the NHL were not subject to personal jurisdiction. *See id.* at 18 n.2.

## IV.   ARGUMENT

### A.   Taking the Complaint Allegations as True, Defendants' Market Allocation Agreement Harms Minors and Young Adults

#### 1.   Market Allocation is Pernicious Anticompetitive Conduct that Violates the Sherman Act

Certain anticompetitive agreements have such a "pernicious effect on competition and lack of any redeeming virtue" that they "are conclusively presumed to be unreasonable and therefore illegal . . . ." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Such agreements are classified as *per se* violations of the Sherman Act, § 1. *See id.*

"One of the classic examples of a per se violation of [section] 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *Topco*, 405 U.S. at 608. Courts have "reiterated time and time again that horizontal territorial limitations are naked restraints of trade with no purpose except stifling of competition." *Id.* (citation modified). These are "market allocation" or "market division" agreements.

When companies allocate markets, they have "the power to restrict output and set high prices—in effect, eliminating price competition. Moreover, the agreements are contrary to consumers' freedom of choice . . . ." Rochella T.

8

Davis, *Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Regulation*, 12 Brook. J. Corp. Fin. & Com. L. 279, 293–94 (2018) (citations omitted).

Given the manifestly anticompetitive nature of market allocation agreements, they are one of only a few types of antitrust violations the U.S. Department of Justice ("DOJ") has historically prosecuted criminally. *See* U.S. DOJ, Archived Antitrust Resources Manual (Nov. 2017), https://www.justice.gov/archives/jm/archived-antitrust-resource-manual.

Courts distinguish between agreements within a supply chain ("vertical agreements") and agreements among competitors ("horizontal agreements"). *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). They analyze horizontal agreements under the *per se* rule and vertical agreements under the more nuanced rule of reason. *See id.* at 1191–92. However, "horizontally situated defendants cannot escape the per se rule simply because their conspiracy depends upon the participation of a middle-man, even if that middleman conceptualized the conspiracy, orchestrated it, and collected most of the booty." *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 440 (3d Cir. 2023) (citation omitted and modified).

### 2. Dividing a Labor Market is Just as Anticompetitive as Dividing a Product Market

Agreements among competitors not to poach one another's workers are a form of market allocation actionable under antitrust laws. *See, e.g.,* *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 871 n.* (7th Cir. 2025); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2013). Just as market allocations of goods and services restrict consumer choice, market allocations of labor restrict worker mobility and depress wages. *See, e.g., Fourqurean*, 143 F.4th at 871 n.* (no-poach agreements limit worker mobility, which "can depress worker compensation") (citation omitted); *see also* Brian Callaci et al., *The Effect of Franchise No-poaching Restrictions on Worker Earnings*, SSRN (June 05, 2024), https://ssrn.com/abstract=4155577 (finding the Washington State Attorney General's 2018-2020 enforcement campaign against no-poach clauses in franchising contracts led to a 6% increase in posted annual earnings from job vacancy data and a 4% increase in worker-reported earnings).

Horizontal labor market allocation agreements are subject to *per se* analysis. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 988–89 (N.D. Ill. 2022) (collecting cases); *cf. Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 n.4 (9th Cir. 2021) (noting

10

"considerable merit" in the contention that the "*per se* rule applies to naked non-solicitation agreements"). A leading antitrust treatise states, "[a]n agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a market-division agreement. . . . If such agreements are horizontal, naked, and among independent firms, they are unlawful per se." 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2013b (4th ed. 2013).[4]

### 3. Plaintiffs' Allegations, Taken as True, Show an Actionable Antitrust Violation

Plaintiffs' allegations, taken as true, demonstrate an actionable antitrust violation of one of the most pernicious varieties. On Rule 12(b)(6) motions, courts must take plaintiffs' allegations as true. *See, e.g.*, *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

At this litigation stage, the mode of analysis has not been established, but taking Plaintiffs' allegations as true, the *per se* rule likely applies: the

---

[4] A "naked" restraint is one "in which the restriction on competition is unaccompanied by new production or products . . . ." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985). Conversely, "[a] restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output." *Id.* at 189.

claims involve market allocation, a classic *per se* violation; the restraints are horizontal, at least in part; and the restraints are naked. The agreement has horizontal aspects as it involves Leagues that occupy the same level of the market structure and Clubs that occupy the same level of the market structure. That the market allocation agreement operates through middlemen (the Leagues) does not allow the Clubs to escape *per se* treatment. *See Winn-Dixie*, 89 F.4th at 440; *see also Topco*, 405 U.S. at 608. Moreover, the restraints are naked as they are not necessary for the product the Leagues and Clubs produce, *i.e.* Major Junior Hockey, to be available. *See* 2-ER-138. Taking Plaintiffs' allegations as true, *per se* analysis is appropriate.

Under *per se* analysis, plaintiffs prevail by proving the existence of a prohibited agreement. *See, e.g.*, *Musical Instruments*, 798 F.3d at 1191. Here, the existence of the agreement appears undisputed. Plaintiffs allege the Major Junior Defendants agreed to allocate the player market by establishing three exclusive geographic territories from which only one League's Clubs may recruit players. 2-ER-139. The record supports the existence of this agreement. *See, e.g.*, Shinder Decl., Ex. 3, § 400-14, ECF No. 42-3 (Excerpt from Central League Manager's Manual describing "Protected Player and Franchise Territories"); Shinder Decl., Ex. 4, § 14.5, ECF No. 42-4 (Excerpt from the

12

CHL Constitution allowing Clubs to select players "within the territory of said Regional League"); 2-ER-197 (noting a Canadian appellate court ruling recognizing a "strictly defined geographic territory" for each League) (citing *Berg v. CHL*, [2019] ONSC 2106 ¶ 9 (2019) (Can.), https://canlii.ca/t/hzjhg). Consequently, the facts alleged present a market allocation agreement that violates the Sherman Act and injures minors and young adults.

Such a classic, manifestly anticompetitive antitrust violation requires a solid basis to affirm dismissal. No such basis exists here.

**B.     Plaintiffs' Allegations Satisfy the "Express Aiming" and "Knowledge of the Harm" Prongs of the *Calder* Effects Test for the Eastern League Defendants**

Upon de novo review, *Briskin v. Shopify, Inc.*, 135 F. 4th 739, 749–50 (9th Cir. 2025) (en banc), this Court should reverse the district court's ruling that it could not assert specific personal jurisdiction over the Eastern League Defendants.

On appeal, Plaintiffs argue that the Fourteenth Amendment's minimum contacts analysis, and thus the *Calder* effects test, is no longer the correct standard when reviewing personal jurisdiction under the Clayton Act, § 12, 15 U.S.C. § 22, due to the Supreme Court's recent decision in *Fuld v. Palestinian Liberation Org.*, 606 U.S. 1, 16 (2025). *See* Appellants' Br. 27–33. If *Fuld*

13

controls here, the federal courts will determine reasonableness inquiries in cases involving Fifth Amendment due process. *See Fuld*, 606 U.S. at 23–24. It would be reasonable to assert personal jurisdiction over the Eastern League Defendants here given that even the prior, more involved test under Fourteenth Amendment minimum contacts—the *Calder* effects test—is satisfied.

The *Calder* effects test requires the defendant (1) commit an intentional act; (2) expressly aimed at the forum state; and (3) which causes harm the defendant knows is likely to be suffered in the forum state. *Briskin*, 135 F. 4th at 750–51. The district court ruled it could not exercise personal jurisdiction over the Eastern League Defendants under the Clayton Act, § 12, finding the "express aiming" and "knowledge of the harm" prongs of the *Calder* effects test lacking.[5] The district court erred by relying on an outdated formulation of "express aiming" that required a "forum-specific focus," and it overlooked allegations in the Complaint and harm suffered in the U.S.

---

[5] The district court determined that the Eastern League Defendants did not address, and thus conceded, that they committed an intentional act. 1-ER-27.

### 1. The Eastern League Defendants "Expressly Aimed" Their Conduct at the United States

The district court determined it could not exercise jurisdiction under the Clayton Act, § 12,[6] over the Eastern League Defendants because Plaintiffs had not alleged sufficient contacts with the United States. *See* 1-ER-32, 1-ER-36. It ruled Plaintiffs failed to show those Defendants "expressly aimed" conduct at the United States. *See* 1-ER-32. This view of "express aiming" ignores allegations in the Complaint and conflicts with recent Ninth Circuit precedent.

"An antitrust defendant 'expressly aims' an intentional act at a forum state when its allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal. 2014) (citing *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013)). For instance, in *Western States*, plaintiffs alleged defendant AEP "expressly aimed" conduct at Wisconsin when AEP's officers or directors made agreements "to advance or control the market prices of natural gas that its affiliates sold in the United States or in Wisconsin" and "made 'strategic marketing policies and decisions'

---

[6] Section 12 grants personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation. *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 n.1 (9th Cir. 2024).

to report prices to natural gas price indices 'that affected the market prices of natural gas.'" 715 F.3d at 744. AEP's subsidiary implemented the policies and decisions. *Id.* This Court found these allegations "establish that the AEP Defendants' price manipulation was 'expressly aimed' at Wisconsin, because the AEP Defendants knew and intended that the *consequences* of their price manipulation would be felt in Wisconsin." *Id.* (emphasis added).

As Plaintiffs allege, the Eastern League Defendants "expressly aimed" conduct at the United States by agreeing to allocate recruiting efforts for the various states to only one of the three Leagues and implementing that agreement by limiting their recruiting efforts. *See* 2-ER-139. The purpose and effect of the agreement was to eliminate competition for players' labor, artificially suppress pay, and exploit players' names, images, and likenesses. 2-ER-146–47, 2-ER-244. By restricting competition, Clubs strongarmed players into agreements that paid only a fraction of what players could earn elsewhere and restricted their freedom of movement. *See* 2-ER-140, 2-ER-210–11, 2-ER-249. Thus, the aim of the agreement was to cause harm to players in the U.S. and Canada; the Eastern League Defendants knew and intended the effects would be felt in the U.S.

16

The district court erred in assuming that "the alleged conspiracy here limited [Eastern League] Defendants' conduct entirely to Canada," 1-ER-28, when each of the paragraphs it cited for this proposition specifically alleges each Club directed actions at the U.S. through "its adherence to the market allocation scheme that restricts the [Eastern League] Clubs' ability to recruit and draft players outside of the [Eastern League] Exclusive States, thus causing antitrust injury to Minor Junior Players." 2-ER-178–88. The court failed to analyze whether their reciprocal agreement not to recruit outside their exclusive territory caused antitrust injury (*i.e.*, suppressed wages) to players outside of their territory, including in other U.S. states. Suppressed wages are "an example of the type of injury the antitrust laws are meant to protect against." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012) (citation omitted).

It does not matter that the Eastern League Defendants aimed conduct at both Canada and the United States. *Contra* 1-ER-30. Defendants can "expressly aim" conduct at multiple forums. Earlier this year, this Court clearly articulated that a "forum-specific focus" was *not* required to establish express aiming. *Briskin*, 135 F.4th at 757. It ruled California had personal jurisdiction over defendant Shopify, which provides web-based payment platforms, even

17

though Shopify operates nationwide and "is agnostic as to the location in which it data-mines the consumers' personal identifying information." *See id.* at 748, 757. This Court stated, "requiring differential targeting would have the perverse effect of allowing a corporation to direct its activities toward all 50 states yet to escape specific personal jurisdiction in each of those states . . . ." *Id.* at 758. The Northern District of California recently interpreted *Briskin* to allow courts to exert personal jurisdiction under the Clayton Act, § 12, when an agreement's effects will be felt worldwide because the effects are targeted at and will be felt in the U.S.—as they will be here. *See LyricFind, Inc. v. Musixmatch, S.p.A.*, No. 25-cv-02265-JSC, 2025 WL 2537755, at *5–6 (N.D. Cal. Sept. 3, 2025). The district court erred when it interpreted *Ayla*–a case decided before *Briskin*–to require a forum-specific focus. *See* 1-ER-29 (citing *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 980 (9th Cir. 2021)).

It does not matter that some Eastern League Clubs signed few or no American players. *Contra* 1-ER-30–31. There is no "de minimus" exception to purposeful direction if contacts are not "random, isolated, or fortuitous." *See Ayla*, 11 F.4th at 981; *see also Briskin*, 135 F. 4th at 758. Further, the district court assumed that because a Club did not *sign* a U.S. player, that Club did no recruiting here—ignoring the possibility that some recruiting efforts were

18

unsuccessful. The agreement exclusively allocated six U.S. states to the Eastern League Clubs for recruitment, 2-ER-199, and seven of the 18 Eastern League Clubs signed at least one American player. 1-ER-27 n.7 (citations omitted). This suggests the Eastern League Clubs recruited in the U.S.

### 2. The Eastern League Defendants Caused Harm in the United States and Knew Harm Would be Suffered Here

The district court determined the Eastern League Defendants did not cause sufficient jurisdictional harm in the U.S. to satisfy the "knowledge of the harm" prong, as the Eastern League Clubs are located exclusively in Canada and Clubs signed few or no American players. *See* 1-ER-33–36.

The court erred in focusing on the harm suffered by players the Eastern League Defendants *signed*, not all players affected by the market allocation scheme. *See* 1-ER-33–35. U.S. players in the Western and Central Leagues suffered harm because the Eastern League Clubs did not compete for their labor—the Eastern League Defendants' agreement and adherence to the market allocation scheme suppressed compensation for vulnerable players in all three Leagues. *See* 2-ER-146–47, 2-ER-199. And the court conflated a relative lack of *signed* players from the U.S. with a lack of recruitment efforts here.

19

As discussed above, the Eastern League Defendants knew and intended harm would occur here. This satisfies the "knowledge of the harm" requirement.

Because the district court erred in analyzing "express aiming" and "knowledge of the harm," its ruling on the Eastern League Defendants' personal jurisdiction should be reversed.

## C.      The District Court's International Comity Ruling Erred

Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred upon them. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Nonetheless, principles of adjudicative international comity sometimes lead courts to abstain from exercising jurisdiction and defer to a foreign court's judgment to "maintain[] amicable working relationships between nations." *See Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) (citations omitted).

In making comity determinations, courts must exercise "due regard both to international duty and convenience, and to the rights of [their] own citizens or of other persons who are under the protection of [their] laws." *In re Simon*, 153 F.3d 991, 998 (9th Cir. 1998) (citation omitted). "[I]nternational comity abstentions should be granted only in rare cases, especially in the antitrust

context." William Weingarten, *Divined Comity: Assessing the Vitamin C Antitrust Litigation and Updating the Second Circuit's Prescriptive Comity Framework*, 29 Fordham J. Corp. & Fin. L. 281, 311 (2023) (citing Brief for the United States as Amicus Curiae at 18, *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33 (2018) (No. 16-1220)).

The Ninth Circuit assesses adjudicative comity by evaluating "(1) the strength of the United States' interest in using a foreign forum, (2) the strength of the foreign governments' interests, and (3) the adequacy of the alternative forum." *Mujica*, 771 F.3d at 603. Upon abuse of discretion review, this Court will reverse a district court's determination if its application of the legal standard was (1) illogical, (2) implausible, or (3) without support in the record. *Id.* at 589 (citation omitted). Here, the Court should reverse because the district court's government interests analysis was illogical. Further, the determination that the foreign forum was adequate ignored that Plaintiffs had no remedy in Canada.

### 1. The *Mujica* Test for Government Interests Does Not Favor Abstaining

When assessing U.S. interests, courts consider "(1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the [U.S.], and (5) any

21

public policy interests." *Mujica*, 771 F.3d at 604. "The proper analysis of foreign interests essentially mirrors the consideration of U.S. interests." *Id.* at 607. The district court's analysis of these factors was illogical because it included dismissed claims and failed to correctly weigh foreign policy and public policy interests.

### a. The District Court Erred in Concluding Most Conduct Occurred in Canada

The district court erred in ruling the location of the conduct favored abstention because it considered all of Plaintiffs' claims—even ones dismissed on other grounds—and ignored the locations of Plaintiffs' injuries. *See* 1-ER-66–67.

Before analyzing comity, the district court dismissed claims arising from foreign injuries, except for claims by players recruited from the U.S. 1-ER-63. Remaining claims included: (1) claims from players for U.S. Clubs and (2) claims from players recruited from the U.S. by Canadian Clubs. *See* 1-ER-53–63.

Nonetheless, when the court analyzed comity, it analyzed Plaintiffs' claims as if no claims had been dismissed, ruling that most of the challenged conduct occurred in Canada. *See* 1-ER-66. The court focused on the

negotiation of contracts and promulgation of rules, presuming that would have occurred in Canada because the Leagues are Canadian. *See id.*

The court should have concluded much of the conduct occurred in the U.S. Actions taken by U.S. Clubs furthering the conspiracy, such as negotiating contracts and recruiting players, likely occurred in the U.S. given the locations of those Clubs. Moreover, the court overlooked conduct like recruiting U.S. players and refusing to recruit in certain states, which occurred in the U.S.

The court only discussed injuries to players recruited from the U.S. in passing, stating that injuries of players on U.S. teams could be "counterbalanced by injuries occurring in Canada to those players who were recruited in the [U.S.] to Clubs based in Canada." 1-ER-66. Amici found no other case "counterbalanc[ing]" one set of plaintiffs' injuries against another's while weighing a single country's interests. Further, it is illogical to assume the U.S. has no interest in injuries to residents sent abroad by anticompetitive conduct. State enforcers, like Amici, certainly have an interest in such conduct and an interest in private antitrust plaintiffs' access to courts to vindicate their right to a competitive market.

23

Last, the court overlooked that the "location of the conduct" looks to "not only the action of the defendants but the injury suffered by plaintiffs." *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 908 (N.D. Cal. 2017) (citations omitted). Here, much of the remaining Plaintiffs' injuries occurred in the U.S.

For the foregoing reasons, the district court should have ruled this factor weighed against abstention or was neutral.

### b. In Evaluating the Parties' Nationality, the District Court Erred by Including Dismissed Plaintiffs

The district court similarly erred in finding the nationality of the parties was neutral. *See* 1-ER-67–69. It concluded "[t]he majority of the Parties are undoubtedly Canadian," without omitting the already-dismissed parties. *See* 1-ER-67.

After the court dismissed claims arising from foreign injuries, remaining plaintiffs included (1) players for U.S. Clubs and (2) players recruited from the U.S. *See* 1-ER-53–63. Likely, the vast majority of remaining plaintiffs were U.S. citizens or residents because they resided in the U.S. before recruitment or when they played in the Leagues.

The court's comparison to *Lawson* is inapt. *Lawson* involved shareholder derivative actions against companies incorporated in Canada.

24

*Lawson v. Klondex Mintes Ltd.*, 450 F. Supp. 3d 1057, 1066–67, 1074 (D. Nev. 2020). The *Lawson* plaintiffs argued this factor favored exercising jurisdiction because thousands of shareholders were U.S. nationals. *Id.* at 1074. The court responded, "U.S. nationals are not necessarily more prevalent in this litigation than any other national," finding the factor neutral. *Id.* Unlike *Lawson*, most remaining plaintiffs here are U.S. residents or citizens.

Thus, the district court erred in concluding the majority of the parties were Canadian and should have ruled this factor weighed against abstention.

> **c.      In Analyzing the Character of the Conduct, the District Court Overlooked Allegations and Included Dismissed Claims**

The district court erred in concluding the "character of the conduct" was neutral by overlooking allegations and including dismissed claims.

In antitrust cases, courts analyzing the character of the conduct consider "the relative significance of effects on the [U.S.] as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, . . . and the relative importance to the violations charged of conduct within the [U.S.] as compared with conduct abroad." *Mujica*, 771 F.3d at 606 (citation omitted).

25

The court acknowledged "the [U.S.] has a strong interest in seeing its laws and regulations followed." 1-ER-69 (citation omitted). But it ruled this factor favored abstention because "Canada also has a legitimate interest here" and the conduct "occurred predominantly in Canada, between Canadian entities." *Id.* Moreover, it reasoned, "Plaintiffs have not alleged that 'there is explicit purpose to harm or affect American commerce.'" 1-ER-70.

The ruling on allegations of harm to American commerce contradicts the Complaint. *See, e.g.*, 2-ER-236 (describing "U.S. trade" as "a focal point of Defendants' illegal conduct"). At this stage, the district court must accept the Plaintiffs' allegations as true. *See Adams*, 355 F.3d at 1183. That the court did not do so made its determination erroneous.

It was also illogical to conclude the relative significance of effects on the U.S. was lower than on Canada after the district court eliminated claims relying exclusively on foreign conduct. The Foreign Trade Antitrust Improvements Act ("the FTAIA") "clarif[ied] the Sherman Act . . . to make explicit [its] application only to conduct having a 'direct, substantial and reasonably foreseeable effect' on domestic commerce . . . ." H.R. Rep. No. 97–686 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2487. This Court stated "[i]f a complaint survives [the FTAIA] because the conduct has 'a direct, substantial, and

26

reasonabl[y] foreseeable effect' on American commerce, it is only in an unusual case that comity will require abstention from the exercise of jurisdiction." *In re Ins. Antitrust Litig.*, 938 F.2d 919, 932 (9th Cir. 1991), *aff'd in part, rev'd in part on other grounds sub nom. Hartford Fire Ins. Co. v. California*, 509 U.S. 764 (1993) (quoting 15 U.S.C. § 6a). Here, when considering only remaining claims, those claims affect American commerce because the players came from the U.S. or played in the U.S. Thus, the relative significance of effects on the U.S. should equal or exceed those on Canada.

Given these errors, the district court should have ruled this factor weighed against abstention.

> **d.** **The District Court Erred in Ruling Foreign Policy Interests Favored Abstention When Neither Country Requested Abstention**

The district court erred in determining that foreign policy interests favor abstention on the grounds that neither Canada nor the U.S. expressed interest in this case. *See* 1-ER-70–71.

When neither the U.S. nor the foreign government objects to litigation, that factor weighs *against* abstention. For instance, this Court ruled in *Doe I v. Cisco Sys., Inc.* that it did not implicate comity to recognize aiding and abetting liability against a U.S. corporation regarding China's alleged violations of

27

international human rights. *See* 73 F.4th 700, 720 (9th Cir. 2023). The ruling relied in part on the fact that neither China nor the U.S. requested dismissal of the case. *Id.* at 721. This Court noted, "[s]uits against nongovernmental actors do not raise the same international comity and sovereignty issues inherent in 'claim[ing] a limit on the power of foreign governments over their own citizens . . . .'" *Id.* at 720 (citation omitted); *see also E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 994 (9th Cir. 2006) (no public international issue where the foreign government is not involved in litigation involving private parties).

Likewise, in *GDG Acquisitions, LLC v. Government of Belize*, a case involving a breach of contract claim against Belize, the Eleventh Circuit ruled abstention was not in U.S. foreign policy interests, partially because the U.S. had not filed a statement of interest. *See* 749 F.3d 1024, 1032 (11th Cir. 2014). The Eleventh Circuit distinguished "garden-variety commercial contract actions" from cases dismissed for international comity where the foreign nation had established an exclusive method for adjudicating that type of dispute. *Id.* (citing *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1239–40 (11th Cir. 2004) (suit would have undermined Germany's uniform system for paying Nazi-era claims to thousands of victims); *Bi v. Union Carbide Chems. &*

28

*Plastics Co.*, 984 F.2d 582, 586 (2d Cir. 1993) (suit would have conflicted with exclusive Indian government standing to litigate liability for the Bhopal industrial disaster)).

This matter more closely parallels the Belizean contracts claim than it does the cases involving Nazi-era claims or the Bhopal disaster. Canada has taken no action on behalf of Major Junior Hockey players, nor has it made any statements in this litigation. Moreover, the U.S. has not stated that this case endangers foreign relations. Given the lack of expressed government interest, the district court should have ruled that this factor weighed against abstention.

e.  **The District Court Erred in Minimizing the U.S.'s Public Policy Interest in Enforcing Antitrust Violations on Behalf of Citizens and Residents**

Finally, the district court erred in ruling that public policy interests favored abstention. The court failed to recognize that deferring to Canada's antitrust laws here would violate "strongly-held state or federal public policy" in enforcing the antitrust laws by preventing U.S. courts and enforcers from enforcing the rights of U.S. citizens and residents. *See* 1-ER-71–72 (citing *Lawson*, 450 F. Supp. 3d at 1076).

The Sherman Act "express[es] a 'longstanding congressional commitment to the policy of free markets and open competition.'" *Union Lab.*

29

*Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982) (citation omitted). Because "[t]he Sherman Act is designed to promote the national interest in a competitive economy," even a private plaintiff asserting rights under the Act "has been likened to a private attorney-general who protects the public's interest." *American Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968). Private plaintiff enforcement of the antitrust laws is important for Amici, as resources limit the number and types of cases they can bring.

The U.S.'s interest in enforcing the antitrust laws is comparable to previously recognized public policies under this factor like "preventing trademark violations" or "favoring enforcement of arbitration." *See Mujica*, 771 F.3d at 607 (citing *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 556 (9th Cir. 1992); *Dependable Highway Exp. v. Navigators Ins. Co.*, 498 F.3d 1059, 1068–69 (9th Cir. 2007)).

The U.S.'s public policy interest is particularly important in this case, which involves U.S. citizens and residents. "[C]omity would not be granted if it would result in prejudice to United States citizens." *Cunard S.S. Co. v. Salen Reefer Serves. AB*, 773 F.2d 452, 459 (2d Cir. 1985) (citation omitted); *see also Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937

30

(D.C. Cir. 1984) (finding no "unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum"). And this case involves a particularly vulnerable group of U.S. citizens and residents: minors and young adults.

The district court's ruling could prevent enforcers, like Amici, from challenging future law violations that harm U.S. citizens and residents if those violations extend across international borders. This could embolden conspirators to "multiply their wrongdoing" in hopes of avoiding liability. *See Cole v. Tobacco Inst.*, 47 F. Supp. 2d 812, 815 (E.D. Tex. 1999) (stating that it "goes against common sense" to allow a party to "avoid liability by multiplying its wrongdoing").

The district court erred in ruling that it did not violate U.S. public policy to dismiss claims brought by U.S. citizens and residents when their claims concerned strongly held public policy interests. This factor should have weighed against abstention.

### 2. The Foreign Forum Was Inadequate Because Labor Antitrust Violations Could Not Be Litigated

The district court erred in concluding the foreign forum was adequate because it left Plaintiffs—minors and young adults—without any remedy. In reviewing adequacy, courts ask whether the judgment was rendered via fraud

31

or by an incompetent court, or whether the foreign judgment is prejudicial and "repugnant to fundamental principles of what is decent and just." *Mujica*, 771 F.3d at 608 (citation omitted).

This Court has repeatedly recognized that whether a forum is adequate can turn on whether it could provide plaintiffs with any remedy. For instance, in *Cooper v. Tokyo Electric Power Company, Inc.*, members of the U.S. military sued a Japanese electric company alleging injuries by radiation exposure after an earthquake and tsunami damaged a Japanese nuclear power plant. 860 F.3d 1193, 1197 (9th Cir. 2017). This Court ruled that Japan could provide an adequate alternative forum because the defendant was subject to suit in Japan and "the doors of those courts are undisputedly open to Plaintiffs." *Id.* at 1209. Likewise, in *Lueck v. Sundstrand Corp.*, this Court suggested a foreign forum is inadequate if "it offers no practical remedy for the plaintiff's complained of wrong." 236 F.3d 1137, 1144 (9th Cir. 2001); *see also Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 394 (3d Cir. 2006) (declining abstention in a case involving persons enslaved by the German government during World War II in part because there was no assurance claimants would have a German forum available to them).

32

In *Mohr*, the Canadian case to which the district court deferred, the Canadian Court of Appeal ruled that the statute to which the plaintiffs sought to amend their complaint did not cover labor antitrust violations. *Mohr*, [2022] FCA 145 ¶¶ 34, 40–42 (Can.). The court elaborated that "buy-side" market allocations were foreclosed by the plain language of the statute. *Id*. ¶¶ 40–42. *Mohr* made clear that the plaintiffs had no cause of action under Canadian law.

The court failed to analyze whether Canada's rejection of the claims because defendants were not "competitors . . . with respect to a product," 1-ER-73 (citation omitted), was repugnant to what is decent and just under American antitrust law. The district court incorrectly characterized the lack of buy-side collusion causes of action in Canada as a choice of remedy issue, 1-ER-73–74, even though the Canadian case was dismissed on the pleadings. The question is not whether Plaintiffs could seek their remedy of choice in Canada, but rather, whether they could seek *any remedy* in Canada. When Canadian courts decided *Mohr*, the answer was "no." Consequently, the forum was inadequate, and the district court's analysis erred.[7]

---

[7] Recent changes in Canadian law do not change the calculus. While Plaintiffs could refile their claims in Canada, they may be prevented from litigating claims there by issues such as res judicata or statutes of limitations. Moreover, it would not promote judicial economy to affirm dismissal and require Plaintiffs to refile in Canada.

Given these errors, the district court's international comity ruling was illogical and should be reversed.

## V.    CONCLUSION

For the foregoing reasons, Amici respectfully request this Court reverse the district court's dismissal of the Eastern League Defendants on grounds of personal jurisdiction and the dismissal of all remaining claims under international comity.

RESPECTFULLY SUBMITTED this 19th day of November, 2025.

NICHOLAS W. BROWN
Attorney General of Washington

*s/ Christina M. Black*
CHRISTINA M. BLACK
VALERIE K. BALCH
MIRIAM R. STIEFEL
Assistant Attorneys General
Office of the Attorney General
Antitrust Division
800 Fifth Ave. Ste. 2000
Seattle, WA 98104
206-389-2174
Christina.Black@atg.wa.gov
Valerie.Balch@atg.wa.gov
Miriam.Stiefel@atg.wa.gov

*Counsel listing continues on next page*

ROB BONTA
Attorney General of California
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite
11000
San Francisco, CA 94102

KATHLEEN JENNINGS
Attorney General of the State of
Delaware
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

KWAME RAOUL
Attorney General
State of Illinois
115 South LaSalle Street
Chicago, IL 60603

DANA NESSEL
Michigan Attorney General
P.O. Box 30212
Lansing, MI 48909

RAÚL TORREZ
New Mexico Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501

PHILIP J. WEISER
Attorney General, State of Colorado
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

BRIAN L. SCHWALB
Attorney General for the District of
Columbia
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANTHONY G. BROWN
Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

35

DAN RAYFIELD
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301


PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

DAVE SUNDAY
Attorney General of Pennsylvania
Office of the Attorney General
Strawberry Square
Harrisburg, PA 17120


CHARITY R. CLARK
Attorney General
Office of the Vermont Attorney
General
109 State Street
Montpelier, VT 05602

36

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3929

I am the attorney or self-represented party.

**This brief contains** 6,697 **words,** including 106 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christina M. Black **Date** 11/19/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on November 19, 2025, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I further certify that all participants in this case are registered ACMS users and service will be accomplished by the appellate system.

DATED this 19th day of November 2025.

_s/ Christina M. Black_
CHRISTINA M. BLACK

1